175 Ill. App.3d 778 (1988)
530 N.E.2d 571
In re DAVID HENRY et al., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Debra Munjak, Respondent-Appellant).
No. 2-87-0869.
Illinois Appellate Court  Second District.
Opinion filed October 28, 1988.
*779 *780 *781 Donna J. Cunningham, of Schaumburg, for appellant.
James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.
Peter J. Dockery, Public Defender, of Wheaton (Catherine E. Churm and N. Scott Conger, Assistant Public Defenders, of counsel), guardian ad litem.
Judgment affirmed.
JUSTICE INGLIS delivered the opinion of the court:
Respondent, Debra Munjak, appeals from the judgment of the trial court finding her to be an unfit parent and terminating her parental rights. Respondent contends that the trial court erred by (1) failing to bar testimony from witnesses who had not been disclosed prior to trial; (2) finding that respondent was unfit because she failed to make reasonable progress toward the return of her children; and (3) finding that respondent was unfit because she exposed the children to continuous and substantial neglect and failed to protect them from conditions within their environment which were injurious to their welfare. We affirm.
Prior to February 1984, respondent gave birth to six children fathered by three different men. Respondent was first married to Martin Munjak and gave birth to three sons, Dean, Derrick, and Daniel Munjak. Respondent subsequently divorced Martin Munjak and married Robert Henry. As a result of that union, respondent gave birth to a fourth son, David Henry. Respondent subsequently separated from Robert Henry and began living with Frank Woodhall. Respondent then gave birth to two daughters, Deanna and Deliah Woodhall. In February 1984, all six children ranging in age from nine months old to 14 years old lived with respondent and Frank Woodhall at respondent's home in Westmont, Illinois.
On February 24, 1984, officers from the Du Page County sheriff's *782 department and the Du Page County probation department went to respondent's home to interview respondent's eldest son, Dean Munjak. Respondent met the officers on the front steps of the home and permitted them to enter the home after being advised that they had a court order to do so. The premises and occupants were in deplorable condition at that time. The residence itself is a one-story dwelling with a garage. An industrial size trash dumpster filled with open trash and furniture was located in the driveway, and trash was scattered around the dumpster and front yard of the residence. Full garbage bags were also observed around the exterior of the house, and trash covered the ground three to four feet around the outside walls of the house in almost all directions. The garage was similarly filled with trash and broken furniture. The interior of the house emanated a strong odor of feces, urine, and body odor. The rooms of the house were lit by only two light bulbs, one in the kitchen and one in the living room. The floors of the house were generally dirty and covered with trash. In addition, dog and cat faces and urine were on the floors throughout the house. Respondent kept two dogs, 10 baby chickens, and three to seven cats in the home. The bedrooms contained soiled bedding and unwashed clothing which smelled of urine and body odor. The mattresses were filthy and similarly smelled of urine. The dining room was filled with trash, and the ceiling in that room was damaged and appeared to be caving inward. An 18-inch strip of flypaper was hanging in the dining room and was covered with dead flies. A second strip similarly covered with dead flies was located in the kitchen. The kitchen floor was dirty, and the countertops were stacked with unwashed dishes. The stove and refrigerator were discolored, and the stove was dirty and encrusted with old food. The bathroom floor and fixtures were similarly dirty and covered with trash. The children were all uniformly dirty and smelled of urine. Some of the children had visible sores on their faces and arms.
One of the officers at the scene subsequently contacted the Department of Children and Family Services (DCFS). Charles Munson, an investigator from DCFS, arrived at the residence a short time later. Respondent told Munson that the condition of the house and surroundings was due to financial problems. Respondent subsequently attributed the condition of her home to her own medical problems and the conduct of her boyfriend, Frank Woodhall. According to respondent, she underwent treatment for hemorrhaging on December 24, 1983, and was told to have complete bedrest. Respondent stated that for the next three months she did nothing around the house. During that time, Frank Woodhall would bring bags of trash to the residence *783 where he would sort through them looking for something to sell. Respondent asserted that the condition of the premises resulted from Frank leaving the remainder of the trash scattered around the inside and outside of the home.
The children were removed from respondent's home and placed in foster care. The youngest child, nine-month-old Deliah Woodhall, was initially taken to the Westmont police department. She was observed to be very thin, dirty, and smelled of urine. Upon removing her diaper, officers found open sores around her genitals, and fecal matter in the folds of loose skin in her genital area and thighs. Deliah was subsequently transported to Hinsdale Sanitarium and Hospital, where she was examined. According to the examining physician, Deliah's open sores were caused by infrequent changing, malnutrition, and poor care. The doctor also observed that Deliah had a flattened skull and was suffering from a failure to thrive. Deliah was admitted to the hospital for treatment and subsequently placed in foster care. Respondent was charged and convicted of criminal child neglect and was placed on probation.
In June and July 1984, respondent met with representatives of DCFS to go over the conditions for regaining custody of the children. These conditions were memorialized in the first of a series of client service plans prepared for respondent. Among the conditions or tasks included in the first client service plan were that (1) respondent provide a home of adequate size for all of the children; (2) respondent maintain the home so that it is clean and fit for human habitation; (3) respondent obtain adequate financial support for herself and for all of her children; (4) respondent permit DCFS personnel to inspect the residence; (5) respondent notify DCFS when the residence was ready for inspection; (6) Frank Woodhall provide support for his children when they were returned; (7) respondent and Frank Woodhall obtain counseling on issues surrounding their relationship; (8) respondent resolve her marital relationship with Robert Henry; (9) respondent notify DCFS in the event that respondent and Frank Woodhall separate; (10) respondent have a medical checkup for her current pregnancy (respondent was pregnant with her seventh child, her third by Frank Woodhall); (11) respondent properly care for her new baby to be born in September 1984; and (12) respondent permit DCFS personnel to follow up with a pediatrician for the new baby when born. A separate plan was also put into place for respondent's first husband, Martin Munjak, allowing him to obtain custody of his three sons, Dean, Derrick, and Daniel. Those children were subsequently placed in Martin Munjak's care and are not part of the instant action.
*784 Respondent gave birth to Dylan Woodhall in September 1984. Dylan was removed from respondent's custody at the hospital and placed with the paternal grandparents.
Between July 1984 and October 1986, DCFS prepared five complete client service plans for respondent. The tasks of each plan were basically the same, and respondent's progress on the tasks was reviewed at six-month intervals. At each evaluation it was determined that respondent had failed to make any progress on the tasks set out for her. As a result of her pattern of noncompliance, DCFS referred her case to an adoptions screening committee in July 1985, to determine whether respondent's failure to make progress on the tasks warranted the institution of proceedings to terminate her parental rights. Notwithstanding an affirmative response to that inquiry, DCFS continued to prepare client service plans for respondent until termination proceedings were begun in October 1986. In the interim, respondent and Frank Woodhall separated. However, prior to their separation, respondent became pregnant with her eighth child, her fourth by Frank Woodhall. That child, Dustin Woodhall, was born on March 14, 1986. At that time, respondent was living with her parents and was permitted to care for Dustin at her parents' home. In July 1986, respondent's parents moved out of the State, and respondent voluntarily placed Dustin in foster care with Jack and Diane Narvel. By that time, David, Deanna, and Deliah had similarly been placed with the Narvels.
On October 1, 1986, the State filed a petition to have Dustin adjudicated to be a neglected minor. David, Deanna, Deliah, and Dylan had previously been adjudicated to be neglected minors. Also on October 1, 1986, the State filed its petitions to terminate the parental rights of respondent, Robert Henry, and Frank Woodhall to David, and Deanna, Deliah, Dylan, and Dustin Woodhall. The petitions were subsequently amended, and the case proceeded to trial.
The trial on the petitions commenced in February 1987. At that time, Robert Henry voluntarily terminated his parental rights to the children, and the case proceeded as to respondent and Frank Woodhall. In addition to establishing the above facts, the evidence at trial indicated that Deanna had some behavioral problems at home and at school, and David, who walked with a shuffle when taken from respondent's custody, had since corrected that problem by wearing the proper size shoes.
In establishing all of the above facts, the State called 17 witnesses, 10 of whom had not been disclosed to respondent on a discovery list. Respondent did not object to the testimony of the State's *785 first 12 witnesses, including six who had not previously been disclosed. Respondent did object when the State called its thirteenth witness, the seventh who had not previously been disclosed. Although respondent sought to bar that witness' testimony, she nonetheless admitted that she was prepared for that witness. The trial court denied respondent's motion to bar the testimony and admonished the State to provide respondent with advance notice of witnesses to be called in the future. The State next called respondent as an adverse witness, and respondent objected on the basis that her name had not been included on the witness list provided by the State. Respondent also noted for the first time the State's failure to disclose six of its previous witnesses. Respondent moved to bar the State from calling her as a witness even though her counsel had reviewed the questions that were to be asked of her prior to her being called. Respondent also sought to bar the testimony of future undisclosed witnesses. The trial court denied respondent's motion to bar the State from calling her as an adverse witness. The State later called two additional undisclosed witnesses over respondent's objection. One of these witnesses was permitted to testify after respondent's counsel declined the court's invitation for a continuance and admitted that he was prepared on the witness. The other witness was permitted to testify after respondent's counsel conceded that the witness had no bearing on respondent's case.
On May 8, 1987, the court found Dustin to be a neglected minor and further found respondent and Frank Woodhall to be unfit parents as to David, Deanna, Deliah, Dylan, and Dustin. Written orders incorporating the court's oral findings were entered on June 18, 1987, and a hearing to determine the disposition of this case was held on June 24, 1987. At that time, the trial court entered orders terminating the parental rights of respondent and Frank Woodhall to each of the minors and authorizing the guardian administrator of DCFS to consent to their adoption. Respondent's post-trial motion was denied, and this appeal followed. Pending the outcome of this appeal, the trial court entered an order staying enforcement of that part of its disposition authorizing the guardian to consent to adoption. We note that Frank Woodhall is not a party to this appeal.
Respondent first contends that the State's repeated failure to disclose witnesses and documents prior to trial resulted in surprise and prejudice to respondent and constituted prejudicial error requiring reversal. We disagree.
 1, 2 The purpose of discovery is to ascertain the truth and to eliminate the element of surprise at trial. (People v. Benhoff (1977), 51 Ill. App.3d 651, *786 653.) Truth is at the heart of all discovery, and disclosure is the object of our discovery procedures. (Buehler v. Whalen (1977), 70 Ill.2d 51, 67.) To ensure proper compliance with discovery regarding the disclosure of witnesses, Supreme Court Rule 219(c)(iv) vests the trial court with authority to impose sanctions, including barring a witness from testifying. (107 Ill.2d R. 219(c)(iv); see Tinsey v. Chicago Transit Authority (1986), 140 Ill. App.3d 546, 548; Beasley v. Huffman Manufacturing Co. (1981), 97 Ill. App.3d 1, 4.) However, while such a sanction may be appropriate where a party fails to provide opposing counsel with requested information (Tinsey, 140 Ill. App.3d at 548-49), a trial court's decision to impose sanctions and in choosing which sanctions to impose is within the trial judge's discretion and will not be reversed on review absent a clear abuse of that discretion. (Beasley, 97 Ill. App.3d at 4; Ferenbach v. DeSyllas (1977), 45 Ill. App.3d 599, 603.) In exercising its discretion, the trial court should consider the purposes of discovery, such as the elimination of surprise and ascertainment of truth, and should determine the extent to which those purposes would be offended if sanctions were not imposed. (In re Estate of Stuhlfauth (1980), 88 Ill. App.3d 974, 983.) Factors to be considered by the trial court include surprise to opposing counsel, prejudicial effect, diligence of opposing counsel in seeking discovery, timely objection, and the good faith of the offending party. (Kyowski v. Burns (1979), 70 Ill. App.3d 1009, 1018; see also Bass v. Washington-Kenney Co. (1983), 119 Ill. App.3d 713, 730-31.) The court must seek to accomplish discovery rather than inflict punishment. Jones v. Healy (1981), 97 Ill. App.3d 255, 257.
 3 In the instant action, the trial court entered an order prior to trial requiring the State to provide respondent with a list of the witnesses the State intended to call. The State, to its discredit, failed to fully comply with that directive. Of the 17 witnesses called by the State in its case in chief, 10 were not disclosed to respondent prior to being called. While we note that the trial court expressed its exasperation with the State on several occasions, we cannot agree that the court's failure to bar the testimony of the witnesses as a sanction constituted prejudicial error requiring reversal.
The record indicates that respondent's first objection to a State's witness on the basis of nondisclosure occurred when the State called George Seaton, an employee with DCFS. Seaton was the thirteenth witness called by the State. In her objection, respondent complained about "the discovery that [had] been taking place throughout the process," noting that on at least four prior occasions she had been given documents just prior to a witness taking the stand. Respondent acknowledged *787 that on each of those occasions the court had given respondent additional time to review the documents and to prepare for cross-examination. Respondent further admitted that she was prepared for Seaton. However, respondent nonetheless sought to bar Seaton's testimony and similarly to bar the testimony of future undisclosed witnesses. The court declined to bar Seaton's testimony after concluding that the serious nature of the case required hearing testimony from all of the witnesses. The court further admonished the State to notify respondent of undisclosed witnesses as soon as they became known to the State and to provide respondent with any documents relating to those witnesses.
Respondent was clearly not prejudiced by the State's failure to disclose Seaton as a witness. We find it significant that respondent admitted to the court that she was prepared for Seaton prior to his offering testimony. Although respondent did not cross-examine Seaton, respondent did not argue below, nor has she argued to this court, how she was prejudiced by the State's failure to disclose Seaton as a witness. In light of respondent's representation of preparedness at trial and failure to show prejudice from the nondisclosure of this witness, we find the trial court's decision allowing the testimony to be sound.
Respondent's next objection for nondisclosure of a witness occurred when she was called as an adverse witness. At that time, respondent noted for the record that six other witnesses who had previously testified, including Robert Heft, Nancy Miller, Lou Stachura, Gail Sage, Brian Sheehan, and David Sand, had not been listed as well. Respondent subsequently moved the court to bar the State from calling her as a witness. The court overruled respondent's objection and declined to bar her testimony. Thereafter, respondent's counsel acknowledged that he had in fact reviewed with the State the questions that were to be asked of respondent prior to her being called.
We fail to see how respondent was prejudiced by the State's failure to disclose these witnesses. Regarding her own testimony, notwithstanding the fact that respondent is a party in this action, her counsel admitted that he had reviewed the questions to be asked of her prior to her testimony. With respect to respondent's claim of error as to Heft, Miller, Stachura, Sage, Sheehan, and Sand, respondent's objection came far too late. We note that respondent failed to object when each of those witnesses was called. Indeed, we further note that respondent cross-examined each witness and did so without objection. Moreover, when respondent did finally state her "objection," she did not seek to have the testimony of the previously undisclosed *788 witnesses barred, but rather only the testimony of future undisclosed witnesses. Respondent did not argue below, nor has she argued to this court, how she was prejudiced by the State's failure to disclose these witnesses. Therefore, we find that the trial court did not abuse its discretion in allowing the testimony of these witnesses.
 4 Respondent also objected on the basis of nondisclosure when the State attempted to elicit testimony from Laurie Kassel. Respondent did not object when Kassel was called, but did so only after Kassel's position and relationship to respondent had been established. In addressing respondent's objection, the court stated:
"The purpose of discovery is to enable counsel to adequately prepare his case.
In view of the nature of the case and the seriousness of the case before us, I'm reluctant to prevent any testimony that would be helpful to the Court.
However, by the same token I have no desire to have counsel put at a disadvantage because he has been surprised.
If you feel that this would prevent you from adequately presenting your case, I will defer the testimony until we  We will have further hearings with respect to this."
After respondent's counsel expressed his reluctance to delay the proceedings, the court reassured counsel that a delay under the circumstances was entirely proper because he "was entitled to all the time that [he] need[ed] to properly respond." Respondent's counsel requested a two-minute recess to consider the court's invitation for a continuance and subsequently renewed respondent's motion to bar Kassel's testimony without accepting the court's offer. At the same time, respondent's counsel acknowledged that he had been provided with the documents relating to Kassel's testimony and had the opportunity to look at her testimony. The court denied respondent's motion and permitted Kassel to testify.
In light of this background, we fail to see how respondent was prejudiced by the State's failure to disclose this witness. Respondent did not object to Kassel's testimony until the nature of her testimony became apparent. Since the nature of respondent's objection was nondisclosure, respondent must have known at the moment Kassel was called that she was not on the witness list, and an objection should have been made at that time. Moreover, we note that the court went out of its way to eliminate any surprise that resulted from the State calling this witness. Respondent's counsel declined the court's invitation for a continuance and further acknowledged that he had an opportunity to prepare for the witness. Respondent's counsel in fact *789 conducted a cross-examination without further objection and without any claim of prejudice. Therefore, we find that the court did not abuse its discretion in permitting Kassel to testify.
 5 Respondent's final objection for failure to comply with discovery concerns the testimony of Betty Lou Reese. We note that it was not respondent who objected to Reese's testimony, but rather counsel for Frank Woodhall. Respondent merely objected to not being provided with a copy of a document from which Reese was to testify. Respondent's counsel acknowledged that he was not present at a prior hearing where the document in question was discussed and in fact concluded that "it did not affect [respondent] in any way." After the State tendered a copy of the document to respondent's counsel, the court permitted Reese to testify.
As was the case with the other witnesses, the record indicates that respondent was not prejudiced by the State's failure to disclose this witness. Respondent acknowledged at trial that the document Reese was using to testify had no effect on her case. Moreover, respondent states in her brief that the "witness proved to be one who would have no impact" on respondent's case. The record further indicates that respondent cross-examined Reese, and no evidence of prejudice is apparent. Accordingly, respondent's claim of error as to this witness is without merit.
We are discouraged by respondent's attempt to compel blind adherence to a severe discovery sanction absent any indication of prejudice. In her brief, respondent states that "[i]f the testimony of the ten undisclosed witnesses had been barred, the State's case would have failed." It is apparent from this statement and respondent's arguments below that respondent is less interested in the goal of disclosure than with strict adherence to a permissible, albeit discretionary, discovery sanction for nondisclosure. Such a position reduces the nature of these proceedings to a game, a contest between the attorneys. Terminating parental rights is a grave and serious matter. If the State's case in such a proceeding should fail, it should do so because the State cannot prove parental unfitness, not because testimony which might otherwise be relevant is barred for nondisclosure. Were the latter scenario to prevail, the only clear losers in such a case would be the innocent children involved. The trial court apparently recognized this and went out of its way on a number of occasions to ensure that respondent had sufficient time to prepare her cause and thus eliminate any surprise or prejudice resulting from nondisclosure. We believe that this was the more prudent course to take and sufficiently eliminated any possible prejudice in the instant action. We find *790 no abuse of discretion on these facts. Of course, our holding on this issue should not be construed as condoning the State's conduct in this case. While we believe that the State did not act diligently, its failure to do so under the facts of this case did not constitute prejudicial error.
Respondent next contends that the trial court's finding that respondent was an unfit parent for failing to make reasonable progress toward the return of her children was against the manifest weight of the evidence. Respondent argues that the conditions set forth in the client service plans prepared for her by DCFS were illusory and impossible for respondent to accomplish given her limited education, health, work history, and lack of transportation. We disagree.
 6 It is well established that a finding of parental unfitness must be supported by clear and convincing evidence. (In re Allen (1988), 172 Ill. App.3d 950, 956; see also In re Paul (1984), 101 Ill.2d 345, 352; In re R.G. (1988), 165 Ill. App.3d 112, 133-34.) The findings of the trial court must be given great deference since it has the opportunity to view and evaluate the testimony of the witnesses, and the trial court's decision should not be reversed on appeal unless it is contrary to the manifest weight of the evidence. In re Allen, 172 Ill. App.3d at 956; In re R.G., 165 Ill. App.3d at 134; In re R.M.B. (1986), 146 Ill. App.3d 523, 527-28.
 7 Respondent challenges the court's finding of unfitness pursuant to section 1(D)(m) of the Illinois Adoption Act (Adoption Act) (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m)). That section provides that a parent may be found unfit for failure "to make reasonable efforts to correct the conditions which were the basis for removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor." (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).) Failure to make reasonable efforts to correct conditions and failure to make reasonable progress toward return of the child are independent bases for a finding of unfitness. (In re Allen, 172 Ill. App.3d at 956; In re Austin (1978), 61 Ill. App.3d 344, 349.) Whether a parent's efforts to correct the conditions which were the basis for removing her children are reasonable involves a subjective judgment based upon the amount of effort which is reasonable for a particular person. (In re Allen, 172 Ill. App.3d at 956; In re Doolan (1981), 101 Ill. App.3d 322, 324; In re Austin, 61 Ill. App.3d at 350.) In contrast, whether a parent's progress toward return of the children within 12 months of being adjudicated neglected is reasonable involves an objective judgment based upon the amount of progress measured from the conditions *791 existing at the time custody was taken from the parent. (In re Allen, 172 Ill. App.3d at 956; In re Doolan, 101 Ill. App.3d at 324; In re Austin, 61 Ill. App.3d at 350.) At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification. In re Allen, 172 Ill. App.3d at 956; In re Austin, 61 Ill. App.3d at 350.
 8 The trial court in the instant action found respondent unfit for failure to make reasonable progress toward the return of the children as to all of the children except Dustin. As to Dustin, the court found respondent unfit in that she failed to make reasonable efforts to correct the conditions which led to his removal. Respondent's argument does not appear to challenge the court's finding of failure to make reasonable efforts as to Dustin. In any event, such a challenge would be without merit as the record indicates that respondent made virtually no effort to meet the conditions set for her. We find respondent's argument as to the remaining children to be without merit as well.
 9 There appears to be no dispute that respondent failed to comply with the tasks set forth for her on the client service plans. Rather, respondent merely argues that they were impossible for her to perform. In support of this contention, respondent asserts that DCFS engaged in a course of conduct designed to ensure her failure. Specifically, respondent notes that DCFS did not provide her with a housekeeper and also referred her case for adoption screening as early as July 1985. Respondent does not provide this court with any authority imposing a duty on DCFS to provide her with a housekeeper, and we decline to impose such a duty. Indeed, another section of the Adoption Act provides that a court shall not require a showing of diligent efforts by the agency involved to encourage compliance. (See Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(n); see also In re Paul, 101 Ill.2d at 353.) Moreover, respondent's argument ignores the fact that five separate client service plans were prepared, and DCFS continued to work with her from the time her case was referred to the State's attorney for termination proceedings to the date on which those proceedings were initiated. Thus, we find no evidence supporting respondent's argument concerning agency misconduct.
 10 Respondent also seeks to excuse her failure to make progress in completing the tasks citing her limited financial resources, poor health, and lack of transportation. In our opinion, the handicaps within which respondent seeks refuge have little or no bearing on her ability to complete most of the tasks set forth in the client service plans. We note that the most basic of the tasks set out in each of the *792 client service plans concerned correcting the household environment so as to provide the children with habitable living conditions. Respondent made no progress in this regard, and no evidence was presented which excused her failure to do so. Failure to make corrections in the home environment establishes a lack of reasonable progress. (In re T.E. (1984), 128 Ill. App.3d 449, 451-52.) Accordingly, we find that respondent's failure to perform the tasks set out in the client service plans constitutes clear and convincing evidence that she is an unfit parent for failure to make reasonable progress toward return of the children.
Respondent's final contention is that the trial court erred in finding respondent unfit due to continuous and substantial neglect and failure to protect the children from conditions within their environment injurious to their welfare. Respondent asserts that there were contradictions in the evidence regarding the condition of the children such that the court's findings were not supported by clear and convincing evidence. We disagree.
 11 Rather than exposing contradictions in the evidence, respondent reargues the evidence and offers explanations for the condition of the home and children. For example, respondent states that (1) the condition of the house was the result of her illness and the misconduct of Frank Woodhall; (2) Deanna's behavioral problems were the result of being separated from respondent; (3) Deliah's failure to thrive was the result of respondent's illness, and her flat skull was the result of sleeping on her back; and (4) David's shuffle walk was the result of wearing his older brother's shoes. Of course, the trial court was in the best position to judge the credibility of this evidence at the time it was offered, and its decision will not be reversed absent an abuse of discretion. (In re R.G., 165 Ill. App.3d at 134.) Respondent has not provided this court with a basis to make such a finding in this case.
 12 With respect to Dylan, respondent argues that she was never given an opportunity to care for him. As to Dustin, respondent argues that she cared for him for approximately four months before relinquishing custody, and during that time there was no evidence of neglect. The trial court nonetheless used its findings of unfitness as to Deanna and Deliah as the basis for finding unfitness as to Dylan and Dustin. Evidence supporting a parent's unfitness toward some of her children may serve as a basis for termination of parental rights toward all of that party's children, even where that evidence relates to events occurring prior to the birth of some of the children. (In re J.R. (1985), 130 Ill. App.3d 6, 9.) Thus, notwithstanding the fact that Dylan *793 and Dustin arrived after the other children were taken from respondent's custody, the trial court had an adequate basis for returning a finding of unfitness.
Accordingly, for all of the reasons set forth above, we affirm the judgment of the circuit court of Du Page County.
Affirmed.
LINDBERG, P.J., and UNVERZAGT, J., concur.