*In re* L.M. III, a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Larry Mikel II, Respondent-Appellant).—*In re* D.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Larry Mikel II, Respondent-Appellant).—*In re* C.L.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Larry Mikel II, Respondent-Appellant).—*In re* C.P. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Serena Mikel, Respondent-Appellant).

Fourth District   Nos. 4—90—0052 through 4—90—0054, 4—90—0139 cons.

Opinion filed November 8, 1990.

498

Robert E. McIntire, Public Defender, of Danville, and Shari D. Goggin-Ward, of Urbana, for appellant Larry Mikel II.

Thomas M. Goodwin, of Dougherty, Hofmann & Goodwin, of Danville, for appellant Serena Mikel.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Michael D. Clary, of Danville, guardian *ad litem*.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal by Serena Mikel and Larry Mikel II, respondent parents of L.M., D.M., and C.L.P., respondent minors, currently ages seven, eight, and nine, respectively, from the order of the circuit court of Vermilion County terminating parental rights. On appeal, several issues are raised. These issues include whether the trial court erred by (1) denying a motion to strike the petition to terminate parental rights on the ground the petition was not properly verified; (2) failing to order the State to furnish a bill of particulars; (3) denying a motion *in limine* to exclude approximately 250 pages of discovery furnished to respondent parents by the State three or four days prior to trial, which information was available to the State for some months previous thereto; and (4) allowing, over objections of respondent parents, Alan Jacobs, a clinical psychologist, to testify to his opinion of the parenting skills of respondent parents. Two additional issues raised by respondent parents are whether, as a matter of law, the trial court rendered deficient findings of unfitness regarding (1) the failure of respondent parents to make reasonable efforts to correct the conditions which were the basis for removing the children from their custody, and (2) the inability of the respondent parents to discharge parental responsibilities, which inability will extend beyond a reasonable time period; and whether the trial court's findings of unfitness were contrary to the manifest weight of the evidence. The facts relevant to a review of these issues will be considered as each issue is discussed.

Initially, we will consider whether the trial court erred by denying a motion to strike the petition to terminate parental rights on the ground the petition was not properly verified. This issue is raised only by respondent mother (No. 4—90—0139), who contends her motion to strike the petition to terminate parental rights should have been granted because section 2—13 of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 802—13(2)) requires that all such petitions shall be verified, although the statements therein may be made on information and belief. In this case, the petition to terminate parental rights set forth the allegations against respondent parents and was signed by the assistant State's Attorney, whose signature was notarized using the proper form for notarizing a verified petition. See

Ill. Rev. Stat. 1989, ch. 102, par. 206—105(c).

██ █ The petition in this case was adequately verified. The allegations in a verified pleading are sworn to under oath by the person signing the petition. (See *In re Dragoo* (1981), 96 Ill. App. 3d 1104, 1107, 422 N.E.2d 263, 265 (wherein the "supplemental petition began by stating: 'Rebecca Jones, on oath state [*sic*] on information and belief ***' " and the signature of Jones was notarized similar to the jurat in the case at bar).) Under the circumstances of this case, the signator may verify the allegations on information and belief, which merely means the person has no personal knowledge of the facts alleged. This petition does not expressly state it is made under oath and does not recite that the allegations are made on information and belief. Nevertheless, the State contends the petition is properly verified. In *People v. Audi* (1979), 73 Ill. App. 3d 568, 392 N.E.2d 248, the form required for verification of a criminal information was discussed. In *Audi*, after noting that (1) the purpose of the oath requirement is to hold accountable to charges of perjury those who falsely swear, (2) there is no prescribed form for the verification, and (3) liability may arise regardless of the wording of the oath, the court upheld as proper the filing of an information signed by an assistant State's Attorney underneath whose signature was a jurat signed by a notary simply reading, "Subscribed and sworn to before me this 19th day of December, 1977." (*Audi*, 73 Ill. App. 3d at 569, 392 N.E.2d at 249.) Based on *Audi*, the verification here is sufficient. *Audi*, 73 Ill. App. 3d at 569, 392 N.E.2d at 249.

██ Furthermore, since the requirement of verification is a procedural formality designed as a deterrent to frivolous allegations, the failure to verify a petition does not divest the trial court of subject matter jurisdiction. See *People v. Bradford* (1975), 62 Ill. 2d 21, 338 N.E.2d 182; *People v. Billow* (1941), 377 Ill. 236, 36 N.E.2d 339; *In re L.E.J.* (1983), 115 Ill. App. 3d 993, 451 N.E.2d 289; *In re Estate of Mears* (1982), 110 Ill. App. 3d 1133, 443 N.E.2d 289. See also *Dragoo*, 96 Ill. App. 3d 1104, 422 N.E.2d 263.

██ The next issue to consider is whether the trial court erred by failing to order the State to furnish a bill of particulars. Respondents complain the petition for termination of parental rights merely alleges improprieties on the part of respondent parents by reciting subsections of the pertinent statute. (See Ill. Rev. Stat. 1989, ch. 40, par. 1501.) According to respondents, these allegations are not sufficiently precise as to afford respondent parents the opportunity to prepare a proper defense. The State contends respondent parents have waived this argument on appeal by failing to object to the trial court's ruling,

failing to object to the State's disclosures pursuant to that ruling, and proceeding to trial. In her reply brief, respondent mother suggests that, after the trial court's ruling, any future objections would have been futile. It is important to note that in their original briefs, respondent parents do not contend the petition failed to state a cause of action. Had this been the issue, it could not have been waived. (*In re B.K.* (1984), 121 Ill. App. 3d 662, 460 N.E.2d 43.) Respondent father does attempt to make this argument in his reply brief, however. Nevertheless, arguments raised for the first time in a reply brief are waived (see 107 Ill. 2d R. 341(g)) and need not be considered by this court. *Hall v. Humphrey-Lake Corp.* (1975), 29 Ill. App. 3d 956, 331 N.E.2d 365.

In any event, any error which may have occurred is harmless. Respondent parents proceeded to trial and nowhere do they demonstrate how they were surprised or prejudiced by the evidence presented by the State.

■ Except as otherwise provided by statute, the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 1—101 *et seq.*) applies to all proceedings in the circuit courts. (Ill. Rev. Stat. 1989, ch. 110, par. 1—108.) In *In re Harpman* (1985), 134 Ill. App. 3d 393, 480 N.E.2d 873, this court stated that proceedings pursuant to a petition for adjudication of wardship are civil in nature. While the State does not assert there is no requirement that the petition in this case conform to rules of civil pleading practice, the State argues respondent parents' request was not really a request for a bill of particulars, but was instead a request for discovery to which respondent parents were not entitled. Certainly this is true in criminal cases cited by the State, including *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999. However, this court need not decide whether such discovery is available in termination of parental rights cases.

■ Section 2—607 of the Code (Ill. Rev. Stat. 1989, ch. 110, par. 2—607) provides that a party who is to respond to a pleading may file a demand for a bill of particulars if the allegations in the pleading "are so wanting in details that the responding party should be entitled to a bill of particulars." A passage of *In re Walton* (1979), 79 Ill. App. 3d 485, 398 N.E.2d 409, may be read as suggesting that the statute allowing for a demand for bill of particulars pertains to this type of case.

■ If the pleading contains facts which reasonably inform the opposing party of the claim that party is called upon to meet, the pleading is not bad in substance. (*Harpman*, 134 Ill. App. 3d 393, 480 N.E.2d 873.) In *In re G.W.S.* (1990), 196 Ill. App. 3d 107, 109, 553

N.E.2d 85, 87, this court discussed sufficiency of pleadings in a termination of parental rights case and decided "[t]he requirement of pleading with specificity does not mandate there be more than a setting forth of the specific statutory grounds of unfitness." In *Dragoo*, cited in *G.W.S.*, this court stated:

> "We did not intend to indicate [*In re Westland* (1976), 48 Ill. App. 3d 172, 362 N.E.2d 1153,] that pleading with particularity required more than setting forth the specific statutory grounds of unfitness. We did not intend to require allegation of the particular acts or omissions which together constituted the specified statutory grounds of unfitness." (*Dragoo*, 96 Ill. App. 3d at 1107, 422 N.E.2d at 265.)

Therefore, based on *Dragoo* and *G.W.S.*, the petition in this case sufficiently apprises the respondent parents of the charges which must be defended.

Two cases cited by respondent parents are clearly distinguishable. *In re Westland* (1976), 48 Ill. App. 3d 172, 362 N.E.2d 1153, involved a complete failure to allege any of the grounds listed in the Adoption Act (see Ill. Rev. Stat. 1989, ch. 40, par. 1501 *et seq.*) and this court stated that allegations sufficient to find dependency are not sufficient for unfitness. Similarly, in *B.K.*, instead of properly alleging unfitness, the petition alleged the minor to be neglected. In both cases, the court decided the petition failed to state a cause of action.

■ The third issue is whether the trial court erred by denying a motion *in limine* to exclude approximately 250 pages of discovery furnished to respondent parents by the State three or four days prior to trial, given this information was available to the State for some months earlier. Although both parents filed motions in the trial court in an attempt to preclude the State from using materials disclosed in discovery only a few days before trial began, on appeal only respondent father raises this issue (Nos. 4—90—0052, 4—90—0053, 4—90—0054). However, his brief does not explain how he was prejudiced by the trial court's ruling. Respondent father did not ask for a continuance of the hearing so as to allow his counsel to become more familiar with the material. And the hearing was conducted intermittently, with several days between some of the court appearances. There seems to have been time for counsel to become familiar with it. So, although the State could have been more diligent in disclosing these matters, reversal is not warranted. After all, the sanctions imposed are a matter of discretion with the trial court.

■ The State persuasively argues the respondent father waived this issue by failing to object at trial to the admission of any of this

evidence. In *Romanek-Golub & Co. v. Anvan Hotel Corp.* (1988), 168 Ill. App. 3d 1031, 1040, 522 N.E.2d 1341, 1347-48, the court stated:

"Generally, an objection to the admission of evidence must be made when the evidence is offered. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817.) Here, counsel not only failed to object when the 'Letter Agreement' was offered into evidence, but he expressly acquiesced in its publication to the jury. Under these circumstances, defendants have not preserved the error of which they have complained on appeal. Moreover, we do not believe that the requirement of a contemporaneous objection was obviated by the denial of defendants' pretrial motion *in limine*.

A motion *in limine* merely presents an issue of admissibility of evidence which is likely to arise at trial in a pretrial setting. As such, the order, like any other interlocutory order, remains subject to reconsideration by the court throughout the trial. (*Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 5, 422 N.E.2d 241.) 'When a motion *in limine* is made, the trial judge must exercise his discretion in granting the motion or in denying it, thereby leaving to the unsuccessful movant the procedure of specially objecting to the evidence when it is offered at trial.' *People v. McClain* (1978), 60 Ill. App. 3d 320, 324, 376 N.E.2d 774, citing *Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 195, 359 N.E.2d 752.

This procedure would not have required counsel to object in front of the jury each time reference was made to the 'Letter Agreement' at trial. Rather, counsel could have objected once, outside the presence of the jury, and asked for a continuing objection. (See *Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 6, 422 N.E.2d 241.) No such objection was made in the case at bar."

We agree that respondent father, by not making an objection at trial, failed to properly preserve this issue for review.

■■ Moreover, we disagree with respondent father on the merits. In *Savitch v. Allman* (1975), 25 Ill. App. 3d 864, 323 N.E.2d 435, a case cited by respondent father, the court noted that the purpose of discovery sanctions is not merely to penalize the party who is less than diligent in complying with discovery procedures, but instead to accomplish the objectives of discovery. *Savitch* is, however, distinguishable on its facts. In *Savitch*, the sanction imposed was awarding attorney fees and not dismissal of the cause of action. In this case,

respondent parents sought only to have the petition dismissed which the trial court could reasonably find to be an excessive penalty. *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460, the only other case cited by respondent father in his appellant brief, involved the striking of a defendant's answer. However, in *Buehler*, the defendant, Ford Motor Company, provided false answers to interrogatories under oath and failed to produce other requested matters. The circumstances in this case are not so egregious.

Had respondent father made a proper request here, it is conceivable the trial court might have considered granting a continuance or awarding attorney fees and costs on the presentation of a proper motion. But the trial court's denial of the request to dismiss the petition was certainly not an abuse of discretion.

On the other hand, the State's attempt to justify the late disclosure is inadequate. Even recognizing the Illinois Department of Children and Family Services (DCFS) is not an investigative governmental body such that the information possessed by DCFS is not imputed to the State (*People v. Smith* (1987), 152 Ill. App. 3d 589, 504 N.E.2d 850; *People v. Visgar* (1983), 120 Ill. App. 3d 584, 457 N.E.2d 1343), this does not justify the failure of the State to request the information be produced so as to be able to supply it to respondents at a reasonable time before trial. Nevertheless, the policy stated in *In re Henry* (1988), 175 Ill. App. 3d 778, 789, 530 N.E.2d 571, 578, is undoubtedly correct:

> "It is apparent from this statement and respondent's arguments below that respondent is less interested in the goal of disclosure than with strict adherence to a permissible, albeit discretionary, discovery sanction for nondisclosure. Such a position reduces the nature of these proceedings to a game, a contest between the attorneys. Terminating parental rights is a grave and serious matter. If the State's case in such a proceeding should fail, it should do so because the State cannot prove parental unfitness, not because testimony which might otherwise be relevant is barred for nondisclosure. Were the latter scenario to prevail, the only clear losers in such a case would be the innocent children involved."

Objections were made at trial to some of this testimony, but not on the ground that the material was not properly disclosed. Most of the objections concerned the fact the evidence was irrelevant because it pertained to matters arising after the filing of the petition. Respondent father argues the trial court improperly refused to exclude as irrelevant evidence of occurrences arising after the date of

the filing of the petition for termination of parental rights. However, this court has already determined that matters occurring right up to the date of the hearing on termination of parental rights may properly be considered. *In re N.H.* (1988), 175 Ill. App. 3d 343, 529 N.E.2d 1115.

The next question is whether the trial court erred by allowing, over objections of respondent parents, Alan Jacobs, a clinical psychologist, to testify to his opinion of the parenting skills of respondent parents.

Jacobs had been practicing for 20 years. He has a doctorate from Brigham Young University. He saw each of the respondent parents for three individual consultation sessions. The first two sessions were to gather information and the third session was "to put together my thinking and go over issues with them."

As to respondent mother, Jacobs interviewed her to do a personality assessment for the purpose of offering an opinion as to her parenting skills. Jacobs had previously examined persons to assess parenting skills and the ability to develop those skills. These examinations were done at the request of the DCFS. He testified to such matters in over a dozen other cases. In addition to testifying concerning the examination, he testified to his opinion.

In his training, Jacobs has had courses on child development wherein issues of nurturing were stressed. In his practice, he has been involved in many cases of therapy and evaluation involving children, parents, and the general issue of child care. He has received from DCFS reprints of journal articles and reads additional journals.

Prior to further direct examination, respondents' respective counsel were allowed to cross-examine Jacobs concerning his qualifications. On cross-examination, Jacobs testified he recalled two of the other cases he had testified in involved issues of overt physical violence to a child, three or four involved sexual violence, and the rest concerned psychological abuse and neglect. His involvement was limited to evaluating the parent-child relationship. He was not involved in the counseling.

In evaluating adults, Jacobs commonly used the Minnesota Multiphasic Personality Inventory (MMPI). The test requires at least the ability to read and write at a sixth-grade level. However, the primary vehicle for the evaluation was a face-to-face interview following questions of personal history, history of the marriage, and history with the child. The MMPI gives a description of personality variables, scoring on 10 clinical issues of pathology as well as on three validity scales, according to Jacobs. Jacobs noted there are hundreds of psychological

tests that may be used, but he usually uses the MMPI, although he may also use an intelligence test if he has concern about the person's level of intelligence. In this case, he did not use the MMPI.

Jacobs has two children and has aided in their parenting and shared in that experience. In the past, a large part of his practice has been in marriage counseling, but it currently is not. Issues of handling the children are often brought up in marriage counseling, and if this is a serious issue driving a wedge between a husband and a wife, then the children will become involved so that the marriage counseling is transformed to family counseling. Family counseling includes consideration of parenting for the children and the parenting ability or responsibilities inasmuch as such counseling involves interaction with the children. With regard to his experience in child psychology, the first six months of his clinical practice were on a children's unit of a mental hospital and he had a number of courses specifically relating to child development and child-parent relationships. During his private practice, he counseled with children on child psychology matters.

On further direct examination, Jacobs did not use the MMPI in this case because "there were problems with compliance and getting the respondents in." Jacobs felt the respondent father did not meet the educational, intellectual criteria for the test. He felt that respondent mother's capability of delivering a meaningful test result was borderline. He also believed that after three hours of contact, he had a reasonably clear opinion of the respondents. After the first appointment, which was in April or May 1988, there was a four-month period during which the remaining appointments were not secured even though both respondents were informed of the need for additional follow-up. Jacobs was not sure what the reasons were for the delays.

As to respondent mother, Jacobs opined that she lacked the maturity and personal responsibility skills necessary to provide safe and healthy care for children. Jacobs was specifically referring to respondent mother's ability to think of others, to deny her own needs and wants in favor of those of another person, to look at issues objectively, to see her own faults and make corrections, and to desire to do well at given tasks. Respondent mother denied a problem in the parenting relationship and tended to displace blame onto others. She viewed the evaluation process as antagonizing her, and she did not wish to participate. She seemed more interested in denying and refuting charges against her rather than aiding Jacobs in developing a picture of her home situation and how she had performed as a parent in the past. Although Jacobs suggested three or four weekly visits to conclude the evaluation process, respondent mother did not follow up

with that suggestion, and it was Jacobs' impression that DCFS had to pressure her to continue the evaluation process. He also noted she was charged with neglecting one child, who required hospitalization because the utilities were disconnected during the wintertime, and charges of the children running outside improperly dressed in cold weather. She responded that the utilities had been disconnected and it was the utility company's fault her child became ill. Jacobs did not view that as a responsible attitude. He also noted she was quick to become emotionally aroused and she had "borderline to dull intellectual functioning."

His last visit with her was in September 1988, and he had not seen her since. Jacobs believed the characterological issues raised concerning respondent mother are not likely to change in the near future. According to Jacobs, a "characterological issue" is a repetitive pattern of behavior.

Jacobs also opined that respondent father was "deficited intellectually" and was probably in the mild range of mental retardation. According to Jacobs, respondent father's ability to grasp and understand many normal issues was very tenuous. Respondent father, in Jacobs' opinion, had a problem with responsibility and "would not likely be able to administer properly to the children's needs when in conflict with his own." Jacobs also applied the label "borderline personality disorder" to respondent father. Jacobs defined this as a diagnostic category applied to "people who have difficulty obeying the laws of the land; people who have difficulty in most of the important relationships in their life, working relationships, marital relationships, friendship relationships; people who have a tendency to abuse mind-altering substances, alcohol and drugs." While respondent mother did not appear to appreciate the seriousness of what Jacobs was trying to do, respondent father was very quiet. Although he volunteered very little, he did answer questions more willingly.

On cross-examination, Jacobs admitted that prior to meeting with respondent parents, he was provided with a copy of the DCFS report, which included a narration of the allegations of neglect. When asked whether he accepted the narrative as being true, Jacobs responded that he accepted the narrative as a list of charges. One of the tests he had respondent mother perform was to count backwards from 100 by sevens. These tests were to draw some conclusions regarding her intellectual and mental judgment. Jacobs found respondent mother to be unsophisticated intellectually, which he defines as "functioning somewhere below normal." Jacobs was advised by respondent mother that she had been involved in parenting classes and marriage counsel-

ing. He noted that counseling is not always required for a person to grow up emotionally and in most cases this can be done on his or her own. With regard to Jacobs' assessment of respondent mother as lacking personal responsibility, he offered no opinion about her dangerousness. He did not feel there were indications of dangerousness. He could not say she was dangerous in an overt manner.

Whether respondent mother's going to marriage counseling reflected an attempt to take responsibility for her life depends on her attitude. Jacobs admitted it would be much clearer that a person who did not go to marriage counseling or parenting classes was being irresponsible.

In two separate instances, Jacobs recalls respondent mother blaming others for her problem. In the first instance she stated "I'm not crazy. I don't need to be here." From this statement he inferred she believed she was being unnecessarily subjected to something against her will. She also stated the only reason this matter ever came to the attention of DCFS was because her husband's stepfather was angry with her and filed false charges. Jacobs indicated there was additional information as well dealing with the issue of responsibility. Respondent mother indicated to him that she did the cooking and provided food for the children. Jacobs admitted this was one element of proper caring for the children. He discussed with her the provision of clothing for the children with regard to the assertion the children had been allowed to leave the house improperly clothed, rather than in a more general sense, although he admitted proper clothing is an issue for parenting. Jacobs explained he was looking at specific issues of responsibility, well-being, and judgment which he felt were "significantly ongoing to be a threat to the children." That is not to say other things were not being done right. Jacobs agreed that his assessment was only a partial opinion on respondent mother's ability to provide for the children in that it did not touch on all the issues that it could have.

Jacobs discussed with respondent father the allegations of physical abuse and neglect referred to in the DCFS report. A good portion of the three hours was spent gaining general history as well as a mental status. Jacobs did not recall discussing respondent father's personal relationship with any friend. He did discuss employment history and any problems he might have with his jobs. They also discussed his relationship with his wife. Jacobs' report indicates respondent father had completed tenth grade by age 18 and also indicated he had been in special education classes. Respondent father had difficulty reading and writing and relied on his wife to pay bills and read the mail. The

report indicated respondent father offered little information on his own. When asked whether respondent father had a problem expressing himself, Jacobs explained respondent father did not speak with a great deal of sophistication grammatically or in terms of vocabulary. Jacobs further explained that this does not mean respondent father is a quiet person, because persons who are quiet in this type of interview situation are not quiet other places. Jacobs had to extract information from respondent father through questioning, rather than respondent father volunteering the information. Jacobs stated this cannot generally be attributed to his mild retardation.

Knowing that respondent father had completed parenting classes would not alter Jacobs' opinion. Jacobs did not find anything to support the notion that respondent father was actively violent. Jacobs expressed concern about the neglect, but agreed his opinion in that regard could be changed through counseling. He would be less concerned if there were reports from counseling agencies indicating significant improvement in attitudes about responsibility and care for the children.

Jacobs discussed living arrangements with respondent father. The respondents were living in a trailer at the time of the allegations and at the time of the interview. Jacobs did not recall asking respondent father questions relating to providing housing, clothing, or food for the children as being part of his role as a parent. Nevertheless, Jacobs believed his opinion was accurate. Jacobs felt that those questions are so obvious virtually no one would deny these provisions are part of the parenting role. He was concerned with the reality of the situation.

Jacobs' report stated: "[Respondent father] indicated no intention of changing his personal habits with the children, considering himself to be above blame initially. And that together with his limited intellectual capability I feel make him a very questionable candidate to regain parental rights." Jacobs stated respondent father blamed others just once. However, with regard to respondent father there are a number of concerns in addition to maturation, including substance abuse, vocational responsibility, and the ability to understand intellectually. Jacobs admitted these problems could be alleviated or partially alleviated through counseling.

The respondent parents' challenge to the testimony of Jacobs encompasses two areas. Both respondent parents contend Jacobs was not qualified to tender an opinion as an expert. Respondent father also argues that the foundation for the opinion offered by Jacobs was inadequate. Respondent mother's brief might be construed to make

the same argument, but merely concludes "his opinion was nothing more than baseless conjecture and gossip," without citing any legal precedent, which ought not be elevated to the level of legal argument.

In *Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1051, 532 N.E.2d 1091, 1101-02, *aff'd in relevant part* (1990), 138 Ill. 2d 404, this court stated:

> "An expert witness is a person whose special knowledge, skill, experience, training, or education is determined by the trial court to qualify said witness to testify to an opinion, based upon the witness's experience, because the opinion will aid the trier of fact in resolving a question which is beyond the understanding or competence of persons of common experience. Whether the person qualifies as an expert is a matter resting in the sound discretion of the trial court. *Craft v. Acord* (1974), 20 Ill. App. 3d 231, 313 N.E.2d 515.
>
> \*\*\*
>
> Certainly, a witness may not guess or state an opinion which is based merely on speculation or conjecture. (*Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 518 N.E.2d 638.) However, the expert may give an opinion without disclosing the facts which underlie or support his opinion and it is the burden of the opposing party to bring out those facts on cross-examination. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.)"

Also pointed out in *Loitz* is the principle that the credibility of the expert and the weight to be assigned to the expert's opinion are matters to be decided by the trier of fact in light of the expert's credentials and the bases for the expert's opinions. *Loitz*, 177 Ill. App. 3d at 1054, 532 N.E.2d at 1103.

Considering the testimony regarding the credentials of this witness, the trial court committed no abuse of discretion in allowing Jacobs to testify as an expert. Furthermore, the trial judge could rely on Jacobs' testimony if the trial judge found the witness to be credible, in spite of the deficiencies in his testimony, which respondent father claims exist. Nor does the fact the expert expressed an opinion about an ultimate issue require reversal since the expert may so opine. *Perschall v. Metropolitan Life Insurance Co.* (1983), 113 Ill. App. 3d 233, 446 N.E.2d 570.

The remaining two issues may be considered together. These issues are whether, as a matter of law, the trial court rendered deficient findings of unfitness regarding (1) the failure of respondent parents to make reasonable efforts to correct the conditions which were

the basis for removing the children from their custody; and (2) the inability of the respondent parents to discharge parental responsibilities, which inability will extend beyond a reasonable time period; and, last, whether the trial court's findings of unfitness were contrary to the manifest weight of the evidence. Respondent father attempts to raise the question of the sufficiency of the evidence by attacking the trial court's denial of his motion for a judgment at the close of the State's case in chief. The State correctly points out that by producing evidence following the denial of the motion, respondent father has waived the issue for purposes of appeal. (*Fear v. Smith* (1989), 184 Ill. App. 3d 51, 539 N.E.2d 1297; Ill. Rev. Stat. 1989, ch. 110, par. 2—1110.) The obvious reason for that result is the trial court's ruling on the motion becomes merged into the judgment.

As the issue is raised by respondent father, it is waived. However, respondent mother properly raises the issue by asking this court to consider whether the judgment is against the manifest weight of the evidence, without reference to whether a judgment should have entered at the close of the State's case.

As respondent mother points out, the trial court found respondent parents unfit based on five statutory grounds. Respondent mother challenges two of those findings as deficient as a matter of law. Obviously, if any of the remaining three grounds is sufficiently supported by the evidence to warrant finding respondent parents unfit, the respondent mother's challenge to the legal sufficiency of two of the judge's findings need not be considered.

In *In re R.B.W.* (1989), 192 Ill. App. 3d 477, 499-500, 548 N.E.2d 1085, 1099-1100, this court recited the appropriate standard for reviewing termination of parental rights cases:

> "Parental rights and responsibilities are matters of deep human importance and will not be lightly terminated. Parental rights may be terminated if the parent is adjudicated unfit for one or more of the grounds listed in section 1(D) of the Adoption Act. (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D); Ill. Rev. Stat. 1987, ch. 37, par. 802—29(3); *In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983.) In order for the trial court to find parental unfitness, there must be clear and convincing evidence to support such a finding. (*Paul*, 101 Ill. 2d 345, 461 N.E.2d 983.) However, the question on review is whether the finding of the trial court is against the manifest weight of the evidence. (*In re Boolman* (1986), 141 Ill. App. 3d 508, 491 N.E.2d 1.) It is not the function of the reviewing court to reweigh the evidence or reassess the credibility of the witnesses. Great deference is

given to the findings of the trial court since the judge had the opportunity to view the witnesses and evaluate the testimony. (*In re Brown* (1981), 86 Ill. 2d 147, 427 N.E.2d 84.) For the finding to be against the manifest weight of the evidence, the opposite result must be clearly evident from the review of the evidence. *Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 536 N.E.2d 1329."

Because of the length and complexity of the testimony, and as the parties are familiar with the facts of this case, we need not recite the evidence and findings of the trial court in detail. The parties may, however, be assured this court thoroughly reviewed the record in considering the propriety of those findings.

The case at bar went on for several years. During that time, respondent parents moved many times and often failed to maintain a home with proper utilities and which was clean. They blamed their problem on "poverty." Respondent mother is not working and respondent father had a job at the time of the last hearing below, the pay from which, along with supplemental security income, provided enough for respondent parents to live on. While respondent parents testified they could afford to properly care for the children, the trial court was not required to accept that conclusion. In addition, no one other than the parents testified that any progress in parenting skills had been made by these parents on a consistent basis.

Therefore, although not conceding the point, even assuming for the sake of argument that the two findings of the trial court are legally deficient, a conclusion opposite to the finding the respondent parents have failed to make reasonable progress toward the return of the minors within 12 months after the adjudication of neglect is not clearly evident from a review of the evidence.

For the foregoing reasons, the order of the circuit court of Vermilion County terminating the parental rights of respondent parents is affirmed.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.