FIFTH DIVISION

September 10, 1999

Nos. 1-98-0434)

1-98-0908)

In re
 LATIFAH P., a Minor )        Appeal from

)     the Circuit Court

(The People of the State of Illinois, )      of Cook County.

)

Petitioner-Appellant, )      

)

v. )

)      No.  92-J-15983

Veronica P. and Lester P., )      

)      

Respondents-Appellees; )      

)

(Latifah P., a Minor, )         Honorable

)      Marsha D. Hayes,

Respondent-Appellant)). )      Judge Presiding.

PRESIDING JUSTICE THEIS delivered the opinion of the court:

The minor respondent-appellant Latifah P., through the office of the public guardian, and the State's Attorney appeal from a circuit court order finding the child's mother, Veronica P., not unfit following a hearing on a petition to terminate parental rights under section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act)  (705 ILCS 405/2-29 (West 1994)).  At the request of the State's Attorney, the appeals were consolidated.  We are asked to decide whether the circuit court's finding that Veronica was not unfit under sections 1(D)(b), 1(D)(k), and 1(D)(m) of the Adoption Act (the Act) (750 ILCS 50/1(D)(b), (D)(k), (D)(m) (West 1994)) was against the 

manifest weight of the evidence.  Having determined that it was, we reverse the court's order and remand for a hearing to determine whether the termination of Veronica's parental rights and appointment of a guardian with authority to consent to adoption would be in the best interests of Latifah. 

Latifah was born to Veronica on August 14, 1992, and tested positive for cocaine at birth.  Latifah has been in foster care since birth.  On August 25, 1992, the Illinois Department of Children and Family Services (DCFS) filed a petition for adjudication of wardship under section 2-3(1)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(c) (West 1994)), alleging that Latifah was a newborn infant whose blood or urine contained cocaine.  Latifah is the fourth of five children born to Veronica and is the third of her children to test positive for cocaine at birth.

On August 27, 1992, the circuit court entered a temporary custody order, appointing the DCFS guardianship administrator custodian of Latifah.  On March 16, 1993, the circuit court entered an adjudication order, finding Latifah neglected under section 2-3(1)(c) of the Juvenile Court Act.  On September 8, 1993, the circuit court entered a disposition order adjudicating Latifah a ward of the court.  On December 19, 1994, the State's Attorney filed a supplemental petition for termination of parental rights and for appointment of a guardian with the right to consent to Latifah's adoption.  The supplemental petition to terminate parental rights alleged the following grounds of parental unfitness under the Adoption Act (750 ILCS 50/1(D)(b), (D)(c), (D)(k), (D)(m) (West 1994)):  (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to Latifah's welfare (750 ILCS 50/1(D)(b) (West 1994)); (2) desertion of Latifah for more than three months next preceding the filing of the termination petition (750 ILCS 50/1(D)(c) (West 1994)); (3) the parents were habitual drunkards or addicted to drugs for at least one year immediately prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 1994)); and (4) the parents' failure to make reasonable efforts to correct conditions that were the basis of Latifah's removal from their custody and/or failure to make reasonable progress toward Latifah's return within 12 months after the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1994)).

On January 15, 1998, the circuit court terminated the father's parental rights.  The father, Lester P., has not filed a notice of appeal, and his parental rights are not at issue here.  The circuit court declined to enter a finding of unfitness as to the mother, Veronica, and a permanency planning hearing was scheduled to determine Latifah's future relationship with Veronica.  The court's finding that Veronica was not unfit and the evidence that may be considered when making that determination are the subjects of this appeal.  

The hearing on the petition for appointment of a guardian with the right to consent to Latifah's adoption began on December 15, 1997.  Caseworkers involved with Latifah's case testified and offered evidence bearing on Veronica's conduct from Latifah's birth in 1992 to the hearing in 1997.  

OCTOBER 1992 TO DECEMBER 1993

Kathy Janikowski, a caseworker for Lutheran Child and Family Services (LCFS), was assigned to Latifah's case for approximately 14 months, from October 1992 until December 1993.  Veronica was in an inpatient drug treatment program at Haymarket Center (Haymarket) in 1992 when Janikowski was assigned to the case.  On October 28, 1992, Janikowski met with Veronica at Haymarket and discussed with her the services with which she would need to comply in order to work toward the return of her daughter.  Veronica received and signed a written case plan dated October 29, 1992.  The service plan required completion of drug treatment.  Veronica did not complete the Haymarket program she entered in 1992, although she did complete a parental stress services parenting class on November 24, 1992.  Veronica was discharged from the Haymarket program in December 1992. 

After being discharged from Haymarket, Veronica was referred to other programs.  During the time Janikowski was assigned to the case, Veronica told Janikowski she was attempting to get into drug treatment.  At the time Janikowski left the case in December of 1993, Janikowski had no knowledge of Veronica being in drug treatment, and Janikowski had not received verification that Veronica had completed any drug treatment program.

In early February 1993, Janikowski informed Lester and Veronica that she would be requesting them to perform urine drops.  Janikowski scheduled three appointments from February 25, 1993, to April 1, 1993.  Veronica did not appear for any of the urine drops. 

During the time Janikowski was assigned to the case, the goal was for Latifah to return home, and the parents were scheduled for visits once a week or four times a month.  Sibling visits, which the parents also were allowed to attend, were scheduled once a month.  Janikowski explained that from March 17, 1993, "there was a period of five months where the parents' whereabouts were unknown, and they were not calling for visits or coming for visits."  The parents did arrive unannounced approximately half-way through a sibling visit in the grandmother's home on August 18, 1993.    

On August 30, 1993, Janikowski received a phone call from Veronica.  When Janikowski asked Veronica what had been going on, Veronica said she had been having a "very stressful time in her life."  During the conversation, Janikowski explained to Veronica that she needed to resume drug treatment and visitation in order to work toward Latifah's return.  When Janikowski left the case in December 1993, she was not able to recommend that Latifah return home and evaluated both parents' progress toward Latifah's return during that period as unsatisfactory.  

JANUARY 1994 TO JUNE 1994

Vicky Loess, supervisor of the regular foster care unit for Lutheran Child and Family Services, was assigned Latifah's case from January 1994 to June 1994.  During the six months Loess was assigned the case, Veronica attended 10 of 29 regularly scheduled visits.  According to Loess, Veronica was involved in drug treatment between March and May of 1994, but did not complete drug treatment while Loess was assigned the case.

JUNE 1994 TO APRIL 1995

Bella Curtis, of LCFS, was assigned Latifah's case from June 27, 1994, to April 1995.  Curtis' duties included assisting DCFS in obtaining for the parents any needed services.  In July 1994, the goal for Latifah changed from the expectation that she return home to the goal of long-term foster care.  A letter dated July 21, 1994, from drug counselor, Audrey Thomas to Bella Curtis contained the following "progress report" of Veronica's drug treatment to date.  The letter states Veronica was admitted into outpatient drug treatment on March 1, 1994, and notes that Veronica's last date of attendance to the program was May 3, 1994.  Veronica had not attended any individual or group counseling sessions and had not called to verify her absences.  The letter references urine reports dated March 7, 1994, April 6, 1994, April 11, 1994, and April 25, 1994.  The March 7, 1994, urine report was "positive of cocaine usage."  The April urine reports were all "negative of any illicit drugs usage."  The letter further states:

"Ms. Petterson [
sic
] at this time has completed only two (2) months of her six (6) months agreed upon treatment stay.  She has not met all the requirements to complete her treatment goals at this time.  Ms. Petterson [
sic
] was terminated from [the] program on 6/3/94." 

On October 5, 1994, Curtis attended a mediation with Veronica and Lester to discuss an appeal they had filed regarding the goal change, visitation, and service issues.  As a result of the mediation, the parties agreed that Veronica would be allowed to attend and complete an outpatient program in lieu of the inpatient requirement previously specified.  At this time, Curtis told Veronica that she needed to complete the program. 

On October 31, 1994, the State's Attorney agreed to file a petition to terminate parental rights.  In February 1995, the goal for Latifah changed again from long-term foster care to substitute care pending court decision.  Curtis said the goal for Latifah was changed because the parents were not complying with services and had missed numerous visits.  

Curtis testified that, considering the entire time period she was assigned the case, Veronica's progress toward the goal of Latifah's return home was unsatisfactory.  Curtis explained:

"She was visiting, and she had visited consistently after the case had passed legal screening.  However, as far as services went when I left the case, she had still not entered into an inpatient or outpatient drug treatment program." 

DECEMBER 1995 TO DECEMBER 1997

Leandra Coleman, an LCFS family worker, was first assigned to Veronica's family on December 11, 1996.  Coleman's responsibilities included assisting Veronica and Lester with services and visitation.  On September 13, 1996, Veronica had given birth to her fifth child, Timmy.  Timmy was a full-term baby and was not born with drugs in his system.  In January 1997, Coleman made a home visit to Veronica and informed her that she needed to follow through with all her services and follow the service plan because if she did not involve herself in services, "we would have to screen the baby [Timmy] in."  

Before Coleman's conversation with Veronica, Veronica had not completed drug treatment.  After her January 1997 conversation with Coleman, Veronica involved herself with services.  Veronica enrolled in the Haymarket outpatient program in January 1997.  That program, which Veronica completed, consisted of random urine drops, parenting classes, and basic outpatient meetings.  On June 6, 1997, Veronica received certificates from Haymarket acknowledging her completion of Haymarket's intensive outpatient program and parenting class.   According to Coleman, Veronica involved herself with aftercare upon completing the Haymarket program in 1997.  Veronica's aftercare involvement included attendance at Narcotics Anonymous/Cocaine Anonymous meetings approximately three times per week and participation in random, unannounced urine drops.  Coleman testified that Veronica had tendered urine drops to her since she had been assigned to the case and that all of those drops had been clean. 

Lisa Corbett, a caseworker for LCFS, was assigned to Latifah's case on July 1, 1997, and remained assigned to the case until September 15, 1997.  Corbett testified that, during the time she was assigned the case, Veronica and Lester always attended scheduled visits.  

Darby Baldwin, a foster care caseworker for LCFS, was assigned to the case in September 1997.  Baldwin was responsible for monitoring visits, visiting Latifah and her foster parents in their home, and offering Latifah any necessary services.  Baldwin was not responsible for offering services to Veronica and Lester.  During the time Baldwin was assigned to the case, five visits took place between Latifah and the parents.

The following testimony was elicited from Veronica.  In 1986, Veronica started using drugs for the first time.  Veronica began by using once a month but, by the time Latifah was born, she was using one to three times per week.  Veronica said that she first tried to get help in 1990 when she stayed in Phoenix House 2½ months.  Veronica said that she regressed back into drug use when she was unable to get into aftercare.  Veronica acknowledged that she next entered treatment in 1992 at Haymarket.  Veronica said that she was dismissed from that program after 2½ months and again reverted to drug use.  Veronica recalled that her next attempt at treatment was in 1993 or 1994 at Habilitative Systems Inc. (HSI) where one of her urine drops tested positive for cocaine.  Veronica stated that, between the time of Latifah's birth and the positive urine drop at HSI, she had been using cocaine "[o]ff and on."  Veronica said she remained with HSI for two or three months.  Veronica said that she last used cocaine in 1994 after her admission to HSI.  

According to Veronica, HSI discharged her because she "just

stopped going."  Veronica said she decided to quit going to HSI because she "wanted to stop on [her] own because everybody there was using."  Veronica denied being told that she would have to successfully complete drug treatment before her children could return home.  

Veronica testified that she became involved with Haymarket in 1997 because "that's when I found out I needed a certificate to get my kids back."  Veronica testified that, in January 1997, she reenrolled in the Haymarket outpatient program, a program consisting of random urine drops, parenting classes, and outpatient meetings. 

ANALYSIS

When ruling on parental unfitness, a court is not to consider the child's "best interests."  
In re Adoption of Syck
, 138 Ill. 2d 255, 276, 562 N.E.2d 174, 184 (1990).  "[I]t is the parent's past conduct in the then-existing circumstances that is under scrutiny."  
Syck
, 138 Ill. 2d at 276, 562 N.E.2d at 184.  In a proceeding to terminate parental rights, the State must prove by clear and convincing evidence that the nonconsenting parent is "unfit," as defined under section 1(D) of the Adoption Act (750 ILCS 50/1(D) 
(West 1994)).  705 ILCS 405/2-29(2) (West 1994); 
In re L.N.
, 278 Ill. App. 3d 46, 49, 662 N.E.2d 152, 154 (1996).  

Because the trial court's opportunity to view and evaluate the parties and their testimony is superior to that of the reviewing court, a trial court's finding as to fitness is afforded great deference and will only be reversed on review where it is against the manifest weight of the evidence.  
In re A.S.B.
, 293 Ill. App. 3d 836, 843, 688 N.E.2d 1215, 1221 (1997).  A decision regarding parental fitness is against the manifest weight of the evidence where the opposite result is clearly the proper result.  
In re T.B.
, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991).

We acknowledge that, during the course of this litigation, legislative changes from the period beginning in 1996 and running through 1998 significantly altered the focus and course of child abuse, neglect, and dependency cases in Illinois.  See 705 ILCS 405/1-

5(3) (West 1998).  Sections 1(D)(k) and 1(D)(m) (750 ILCS 50/1(D)(k), (D)(m) (West 1998)) of the Adoption Act were amended to reflect the legislature's newly placed emphasis upon parental responsibility and concurrent planning so that permanency may occur in a child's life at the earliest opportunity.  To that end, the legislature reduced from 12 to 9 months the time period after an adjudication of neglect that is relevant to a determination of parental fitness.  750 ILCS 50/1(D)(m) (West 1998).  For purposes of this case, however, the State argues it met the burden of proof imposed upon it under the 1994 version of the Adoption Act, the version applicable in this instance.

We turn now to the grounds of unfitness alleged by the State.  A finding of unfitness may be based on evidence sufficient to support any one statutory ground, even if the evidence is insufficient to support other grounds alleged.  
In re C.R.
, 221 Ill. App. 3d 373, 378, 581 N.E.2d 1202, 1205 (1991).  In this instance, we shall address two of the grounds under which the State alleged that Veronica was unfit: (1) the allegation that Veronica exhibited addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 1994)), and (2) the allegation that she failed to make reasonable efforts or progress toward the return of Latifah within 12 months after the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1994)).  We do so because the evidence presented and the evidentiary issues that confront us bear, in some measure, upon both grounds.  As to each of these grounds, we find the trial court's decision that Veronica was not unfit to be against the manifest weight of the evidence so as to warrant reversal and remand for a best interests determination.

Section 1(D)(k) of the Adoption Act requires the State to prove by clear and convincing evidence that Veronica was addicted to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 1994)).  As a threshold issue, we are asked to decide when the unfitness proceeding commenced.  Veronica maintains the commencement of the unfitness proceeding did not occur when the State filed its supplemental petition for termination of parental rights on December 19, 1993, but rather occurred on December 15, 1997, the date on which the hearing began.  We do not agree.  

Section 2-101(a) of the Illinois Code of Civil Procedure (735 ILCS 5/2-201(a) (West 1994)) provides that "[e]very action, unless otherwise expressly provided by statute, shall be commenced by the filing of a complaint."  Supreme Court Rule 132 (134 Ill. 2d R. 132) acknowledges that a complaint "or other paper" can initiate a "civil action or proceeding."  Section 2-29 of the Juvenile Court Act  provides that the initial document filed is to be termed a "petition."  705 ILCS 405/2-29 (West 1994).  Therefore, we conclude that the proceedings commenced when the State filed its supplemental petition for termination of parental rights.  Accordingly, the time period determinative of Veronica's unfitness due to her addiction to drugs is the period between December 19, 1993, and December 19, 1994, the date on which the State's Attorney filed its supplemental petition for termination of parental rights.  

The State argues it met its burden to prove Veronica was addicted during the critical period.  Veronica admitted she used cocaine from 1986 until March 1994, when she last attempted treatment during that period.  She completed two months of her six-month agreed-upon treatment and was discharged in June of 1994.  Following her termination from that program, Veronica was informed she needed to complete drug treatment.  In October, she appealed the requirement of inpatient treatment and agreed to participate as an outpatient.  By December 19, 1994, she had failed to enter either.  At a minimum, this evidence affirmatively reveals that Veronica was addicted to drugs for eight years, during which time she repeatedly tried and failed to complete a drug treatment program.

Therefore, we conclude the State proved by clear and convincing evidence that Veronica was addicted to drugs for at least one year prior to the commencement of the termination proceedings on December 19, 1994.  Accordingly, the circuit court's decision that Veronica was not unfit for purposes of subsection 1(D)(k) of the Adoption Act is against the manifest weight of the evidence.  Consequently, we reverse the circuit court's order finding Veronica not to be unfit and remand for a hearing to determine whether the termination of Veronica's parental rights and the appointment of a guardian with authority to consent to adoption would be in Latifah's best interests.  The evidence that Veronica successfully completed a drug treatment program in 1997 is a factor to be considered during the second phase of the bifurcated trial in determining whether terminating Veronica's rights would be in Latifah's best interests.  See 
In re Davonte L.
, 298 Ill. App. 3d 905, 924-25, 699 N.E.2d 1062, 1075 (1998) (noting that the mother's recent sobriety and improvement in her personal life would be relevant during the second phase in determining the best interests of the child).  

We turn next to the reasonableness of Veronica's efforts and progress during the critical statutory period under subsection (m).  The law does not afford parents an unlimited period of time to make reasonable progress toward regaining custody of their children.  
In re D.J.
, 262 Ill. App. 3d 584, 591, 634 N.E.2d 1306, 1311 (1994).  A parent may be found unfit where the parent fails to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor.  750 ILCS 50/1(D) (West 1994).  "Failure to make reasonable efforts to correct conditions and failure to make reasonable progress toward return of the child are independent bases for a finding of unfitness."  
In re Henry
, 175 Ill. App. 3d 778, 790, 530 N.E.2d 571, 579 (1988).  

"Whether a parent's efforts to correct the conditions *** are reasonable involves a subjective judgment based upon the amount of effort which is reasonable for a particular person."  
Henry
, 175 Ill. App. 3d at 790, 530 N.E.2d at 579.  "[W]hether a particular [person's] progress towards return of the child within 12 months of being adjudicated neglected is reasonable involves an objective judgment based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent."  
In re M.C.
, 201 Ill. App. 3d 792, 798, 559 N.E.2d 236, 239 (1990).  "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification."  
M.C.
, 201 Ill. App. 3d at 798, 559 N.E.2d at 239.  

Various districts of this court differ as to the nature and application of the 12-month temporal limitation expressed in subsection (m) of the Adoption Act.  Some districts have held that a parent's fitness under subsection (m) may be determined based upon a consideration of evidence of the entire period after the adjudication and before the filing of a petition to terminate parental rights, even though that period exceeds the 12-, now 9-, month period prescribed by the Act.  
See 
In re S.J.
, 233 Ill. App. 3d 88, 598 N.E.2d 456 (2nd Dist. 1992); 
In re C.R.
, 221 Ill. App. 3d 373, 581 N.E.2d 1202 (4th Dist. 1991); 
In re R.S.
, 174 Ill. App. 3d 132, 528 N.E.2d 25 (3rd Dist. 1988).  

Recently, a panel of this district concluded "it is error for circuit courts to consider a parent's efforts to make reasonable progress toward the return of his or her children outside of the 12-

month period prescribed by the Act."  
Davonte L.
, 298 Ill. App. 3d at 924, 699 N.E.2d at 1074-75.  In 
reaching its decision, the
 
Davonte
 panel concluded that "courts are restricted to allowing evidence only from the 12-month period following an adjudication of neglect in determining parental fitness."  
Davonte
, 298 Ill. App. 3d at 924, 699 N.E.2d at 1075.

We do not agree with the 
Davonte
 panel's evidentiary conclusion.  Rather, we agree with the position advanced by the State in this case, that a literal and correct reading of subsection (m) does not preclude the consideration of evidence regarding the parent's conduct following the expiration of the 12-month period the Adoption Act prescribes.  The conditions imposed upon a parent by subsection (m) are that the parent make "reasonable efforts" and "reasonable progress" within 12 months of the child's adjudication.  Thus, within that 12-month period, a parent must take some action that can be characterized as effort or progress.  Where, as here, a parent takes some action within that time period, a determination of whether that parent's efforts and progress were reasonable may require the consideration of evidence outside the 12-month period in which the conduct was initiated.  

The relevant time period to determine whether Veronica's conduct suggests effort or progress runs from the date of adjudication, March 16, 1993, to March of 1994.  With respect to Veronica's progress toward Latifah's return, we note that Janikowski testified that, for a period of five months, from March 17, 1993, to September 1993, the parents' whereabouts were unknown, and they were not calling for visits or coming for visits.  When Janikowski left the case in December 1993, she evaluated both parents' progress toward return home during that period as unsatisfactory.  During the six months Loess was assigned the case, January 1994 to June 1994, Veronica visited Latifah sporadically.  Based upon this evidence, we cannot say that Veronica's conduct evidenced "demonstrable movement" toward the goal of reunification.

With respect to Veronica's efforts to correct the conditions that led to Latifah's removal, the evidence was that Veronica enrolled in drug treatment within 12 months of the adjudication order.  In order to determine whether this action in the eleventh month of the statutory rehabilitation period constituted the amount of effort reasonable for Veronica, we look to the context and result of her actions.  Veronica entered but did not complete drug treatment prior to 1994.  In March 1994, Veronica again entered treatment.  However, she completed only two months of that six-month agreed-upon treatment and was terminated from the program on June 3, 1994.  Veronica did not pursue drug treatment again until 1997. 

Having reviewed the evidence, we conclude that Veronica's admission to a treatment program in March 1994 constitutes some effort within the prescribed 12-month period to correct the conditions that led to adjudication.  However, when we next consider whether Veronica's efforts or progress during that period were reasonable, we find they were not.  Therefore, we also find the circuit court's determination that Veronica was not unfit under subsection (m) to be against the manifest weight of the evidence so as to warrant reversal.  As we noted before, evidence bearing on Veronica's efforts to rehabilitate herself will be considered in the context of Latifah's best interests in the next stage of the proceedings on remand.

Reversed and remanded.

HARTMAN and HOURIHANE, JJ., concur.