*In re* R.L., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Laura V., Respondent-Appellant).

First District (2nd Division)   No. 1—03—1355

Opinion filed September 21, 2004, *nunc pro tunc* August 3, 2004.

Edwin A. Burnette, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Christopher J. Williams, of counsel), guardian *ad litem*.

JUSTICE GARCIA delivered the opinion of the court.[1]

On January 9, 2002, the State filed a supplemental petition for appointment of a guardian with right to consent to adoption alleging that respondent mother, Laura V., was unfit for (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to her child's welfare (750 ILCS 50/1(D)(b) (West 2000)), and (2) failure to make reasonable efforts and progress toward the return home of her son, R.L. (750 ILCS 50/1(D)(m)(ii) (West 2000)).

A termination proceeding, which is the subject of the instant appeal, began in February 2003. In April 2003, the trial court found respondent mother unfit under section 1(D)(m) of the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2000)). The trial court then terminated respondent mother's parental rights.

Respondent mother appeals, contending: (1) the trial court erred in not specifying the nine-month period in which she failed to make reasonable progress; (2) the trial court's finding of failure to make reasonable progress conflicts with the evidence in the record; (3) her fundamental rights were violated when the trial court disallowed R.L. to return home before the fitness hearing; and (4) the trial court erred

---

[1]This decision was originally filed as an unpublished order under Supreme Court Rule 23. Upon the motions of the State's Attorney of Cook County and the Cook County public guardian, we decided to publish this decision with only minor changes to the body of the text.

in finding it was in R.L.'s best interest to terminate her parental rights. We affirm.

## BACKGROUND

Respondent mother is the biological mother of R.L., born May 16, 1998. The trial court terminated respondent mother's parental rights to R.L. on April 16, 2003. Benjamin Ambriz is R.L.'s biological father and signed a general surrender of his parental rights on March 16, 2000. Ambriz is not a party to this appeal.

Although R.L. is the only child who is the subject of this present case, respondent mother is also the biological mother of Sharicoll, born in December 1994; Cynthia, born in November 1995; and Joey, born in December 2001. The evidence also revealed that respondent mother gave birth to another child shortly before the hearing terminating her parental rights to R.L.

Sharicoll,[2] Cynthia, and R.L. came into the protective custody of the Illinois Department of Children and Family Services (DCFS) in October 1998, when Cynthia was found to have a black eye and several bruises on her body. On October 9, 1998, the trial took protective custody of the three children. Subsequently, the State filed a petition for adjudication of wardship for R.L. alleging he was abused and neglected due to his sibling's marks and bruises, his parents' history of domestic violence, and his mother's history of mental illness.

On January 14, 1999, respondent mother stipulated to the following facts: (1) she had a history of mental illness and a history of domestic violence in her relation with Ricardo L., her paramour and the natural father to some of her other children; (2) Cynthia was observed with a black eye on October 3, 1998, while in the care and custody of Ricardo L.; (3) an October 7, 1998, physical examination of Cynthia revealed she had bruises on her thighs and buttocks for which the respondent mother was unable to give an adequate explanation; (4) Cynthia had several bruises on her body consistent with physical abuse inflicted by respondent mother; (5) Sharicoll had several linear bruises on her thighs and buttocks consistent with physical abuse inflicted by respondent mother; and (6) on October 6, 1998, an anonymous female called the Chicago police department from respondent mother's home stating that she would kill herself and her children if DCFS removed them. Subsequently, the trial court adjudicated R.L. abused due to a substantial risk of physical injury and neglect due to an injurious environment. 705 ILCS 405/2—3(1)(b),

---

[2]Although there are various spellings for "Sharicoll" in the record, we will adhere to the noted spelling.

(2)(ii) (West 1998). However, the trial court stayed the adjudication order pending service on R.L.'s father.

On March 16, 2000, the trial court made R.L. a ward of the court and found respondent mother unable to care for him. The trial court also entered an order giving full force and effect to its January 1999 adjudication order, which found that Ambriz was R.L.'s biological father, and noted that Ambriz had surrendered his parental rights to R.L.

On March 18, 2000, a permanency hearing was held for R.L. pursuant to section 2—28 of the Juvenile Court Act of 1987 (705 ILCS 405/ 2—28 (West 2000)) and a goal of "return home within twelve months" was entered as respondent mother[3] was making substantial progress.

On January 30, 2001, another permanency hearing was held for R.L. The permanency goal entered was "substitute care pending court determination on termination of parental rights." A note attached to the permanency order stated, "Natural father signed general surrender on [March 16, 2000]. Minor is in an adoptive home since five months old. Mother's progress is equivocal."

On January 9, 2002, the State filed a supplemental petition for appointment of a guardian with the right to consent to adoption. The petition alleged respondent mother was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to R.L.'s welfare. 750 ILCS 50/1(D)(b) (West 2000). The petition also alleged respondent mother had failed to make reasonable effort and progress within nine months after adjudication or within any nine-month period after adjudication. 750 ILCS 50/1(D)(m)(ii) (West 2000).

On March 14, 2002, a permanency order regarding R.L.'s welfare was entered. A permanency goal of "substitute care pending [a court] [determination] on TPR [termination of parental rights]" was entered. The trial court also noted that the goal of "return home" had been previously ruled out. It was also noted that R.L.'s father had surrendered his parental rights.

---

[3]The trial court's March 18, 2000, permanency order impacts the interest of R.L. as well as Sharicoll and Cynthia. The permanency order notes that the children's mother and father "[have] made substantial progress towards the return home of this minor." Because R.L.'s biological father had surrendered his parental rights two days prior to the permanency order and R.L.'s biological father was a different man than the biological father of Sharicoll and Cynthia, we assume the reference to "father" and "the parents" regards Cynthia and Sharicoll's biological father.

## Termination Proceeding

### Fitness Hearing

On February 24, 2003, the trial court began respondent mother's termination proceeding and took judicial notice that R.L.'s father had executed, on March 16, 2000, a general surrender of his parental rights. The trial court also took judicial notice of: (1) the January 14, 1999, order adjudicating R.L. abused and neglected; (2) the March 16, 2000, dispositional order making R.L. a ward of the court and finding the respondent mother unable to care for R.L.; and (3) the March 16, 2000, order stating that the January 15, 1999, adjudication order had full force and effect.

Additionally, the trial court entered into evidence, without objection from the parties, several exhibits presented by the State relevant to the issue of fitness. Exhibit 1, a client service plan dated April 22, 1999, contained respondent mother's rated service tasks for January to April 1999. Respondent mother was rated satisfactory for her completion of parenting classes and a drug and alcohol evaluation; however, she was deemed unsatisfactory in addressing domestic violence issues and taking personal responsibility for DCFS involvement in her life. Respondent mother attended therapy but denied any abusive behavior toward her children. Respondent mother's overall progress toward her goal of "return home within 12 months" was "satisfactory."

The State's exhibit 2 was a client service plan dated October 14, 1999, and containing respondent mother's rated task sheets from April to October 1999. Respondent mother's tasks for counseling and domestic violence were rated "satisfactory," and her overall progress was rated "satisfactory."

The State's exhibit 3 was a client service plan dated April 1, 2000. The document contained rated task sheets for October 1999 to April 2000. Respondent mother received a "satisfactory" rating for her individual therapy tasks; however, it was noted that "her progress is much slower." Also, the plan noted that respondent mother was "still having trouble with her parenting techniques" and, specifically, "having trouble with disciplining the children."

The State's exhibit 4 was a client service plan dated October 1, 2000, and covering April to October 2000. Respondent mother's task sheet for individual counseling is rated unsatisfactory due to her "unhealthy and unstable" relationship with her paramour. Her task sheet for attending domestic violence counseling was also rated "unsatisfactory" due to the fact that she "continues to surround herself with violent men." The plan's selected goal was "substitute

care pending a court determination on TPR [termination of parental rights]."

The State's exhibit 5 was the client service plan dated April 2001 and covering October 2000 to April 2001. The plan stated that although respondent mother was attending therapy, her progress was minimal; the plan rated her progress in counseling as "unsatisfactory." Although respondent mother's visits with R.L. were satisfactory, the selected goal for R.L. was substitute care pending termination of parental rights.

The State's exhibit 6 was a client service plan dated October 2001 and covering April to October 2001. Respondent mother's task sheet rated her attending counseling and addressing issues related to DCFS as unsatisfactory. The plan detailed that respondent mother's previous therapy had been discontinued as her therapist was of the opinion that a "return home" goal for R.L. was not possible. The plan also stated that although respondent mother claimed she was attending counseling at a church and had completed 22 sessions, she was unable to provide verification.

The State's exhibit 7 was a client service plan dated April 2002, which stated that the goal for R.L. was substitute care pending court determination of termination of parental rights. The plan noted that respondent mother "had failed to make progress toward the return home of [R.L.]" However, overall the plan rated respondent mother's progress in counseling from October 2001 to April 2002 as "satisfactory."

Following the presentation of the foregoing exhibits, the trial court heard testimony. Dr. Sylvia Mojica-Castillo, a therapist with Mary and Tom Leo and Associates, testified she began working with respondent mother in 1999. At first, Dr. Castillo saw respondent mother weekly, sometimes individually and sometimes with her paramour or children. Dr. Castillo discontinued therapy with respondent mother in May 2001, because she wanted to work toward reunification and Dr. Castillo could not recommend that.

During her first sessions with respondent mother, Dr. Castillo explained to respondent mother that the reason for therapy was to correct the physical abuse suffered by Cynthia. Dr. Castillo stressed respondent mother's actions had to be corrected so that Cynthia, as well as respondent mother's other children, would not be at risk once they were returned home.

During the first year of therapy, Dr. Castillo did not recommend unsupervised visits between respondent mother and R.L. because she had concerns regarding R.L.'s safety based on respondent mother's interactions with male figures in her life. Dr. Castillo focused on teach-

ing respondent mother how her personal life influenced her ability to keep her children safe. Respondent mother took responsibility for physically abusing Cynthia. However, Dr. Castillo testified that respondent mother's main problem throughout therapy was a "growing misunderstanding from [respondent mother's] point of view of [R.L.'s] need to separate and become his own individual and try to set his own agenda and that it was [not] anything personal against her that he did [not] love her, it was that children grow up and they try to learn about the world and be their own person."

On cross-examination by the public guardian, Dr. Castillo testified that some of the milestones she was looking for in respondent mother's therapy related to (1) setting limits for her children without resort to physical punishment, and (2) developing age-appropriate expectations for her children. Dr. Castillo observed that despite attending parenting classes, in several specific instances respondent mother failed to set age-appropriate limits for her children. Moreover, Dr. Castillo testified that respondent mother's relationships with men posed a risk to her children because if she was with a partner who was meeting her emotional needs, she would be unable to put aside her own needs and protect her children from her mate.

Dr. Castillo testified she terminated therapy with respondent mother because of her "lack of progress." When therapy was terminated in May 2001, respondent mother still had not made progress in protecting R.L. from a harmful environment. For example, respondent mother would engage in relationships with men without considering whether the relationships would put R.L. at risk. Dr. Castillo stated:

> "[A]s much as [respondent mother] tried and as much as she loved her children, she was such a needy human being that her needs had to come first. It doesn't mean that she couldn't provide. *** But the emotional needs, her needs, had to come first. She had just not developed as a person enough to see that the children's needs had to come first."

The public guardian also presented several exhibits. The public guardian's exhibit 1 was a therapy progress report written by Dr. Castillo and dated April 18, 2000. Dr. Castillo's report states that respondent mother needed to continue addressing her individual issues as she has no insight regarding how her behavior and lifestyle impacted her ability to protect her children. However, Dr. Castillo's report also noted that respondent mother related well with R.L. and loved him.

The public guardian's exhibit 2 was a therapy progress report written by Dr. Castillo and dated July 18, 2000. The report focused on

respondent mother's couples' therapy with her paramour, Ricardo L. The report states that although the two were in therapy, respondent mother was passive in her interactions with her children and had difficultly asserting herself. As a result, her needs were unmet and she would sometimes become angry. The report warned that respondent mother and Ricardo L. might have difficulty changing their negative pattern of interactions but if their interactions did not change, then R.L. should not be returned to respondent mother.

The public guardian's exhibit 4[4] was a therapy progress report written by Dr. Castillo and dated January 23, 2001. The report concerned respondent mother and Ricardo L.'s couples' counseling and stated, "despite attending all the services required of them, as a couple they have not made the changes necessary to ensure that the children would not be at risk if under [respondent] mother's care." Respondent mother had made advances in employment and in fulfilling her medical needs.

The public guardian's exhibit 5 was a therapy progress report written by Dr. Castillo and dated April 2001. The progress report stated that although respondent mother had made some positive changes in her life, R.L.'s return home was not warranted.

On cross-examination by respondent mother, Dr. Castillo testified that in the early stages of respondent mother's therapy, the focus was on respondent mother's relationship with her paramour, Ricardo L. As therapy progressed, respondent mother was able to separate from Ricardo L. and gain some independence. Dr. Castillo also testified that in a therapy report dated July 1999, she stated that respondent mother would possibly be able to parent R.L. in the future as she had learned about the importance of her children's needs. Moreover, the report stated that if respondent mother were in a stable romantic relationship, it might add to her parenting abilities. Dr. Castillo also testified that in April 2000, after observing visits between respondent mother and R.L., she wrote that respondent mother's interactions with R.L. were not negatively impacted by any problems in her life. In July 2000, Dr. Castillo also wrote that respondent mother had reached a point where she was ready to listen and possibly learn how to set limits for her children. Regarding domestic violence, respondent mother had indicated to Dr. Castillo that when a man was physically aggressive toward her, it was a sign of his virility. Dr. Castillo testified that she terminated therapy with respondent mother in May 2001 and was unaware if respondent mother had made changes in her life since then.

---

[4]The public guardian's exhibit 3 is not included as part of the common law record.

On redirect examination, Dr. Castillo testified that during the course of therapy, respondent mother had engaged in relationships involving domestic violence. Respondent mother's relationships posed a risk to her children because if she could not protect herself, she could not protect her children. The State then rested and the fitness hearing recommenced on April 16, 2003.

Luz Trejo testified for respondent mother. Trejo had acted as the caseworker for respondent mother and R.L. since January 2002. During that time, Trejo had not seen the respondent mother acting in an inappropriate manner towards R.L.

Respondent mother then introduced exhibits 2, 3, 4, 5 and 6, which were visitation records from: June 17, 1999; July 23, 1999; May 5, 2000; June 2, 2000; and August 9, 2001, respectively. These records contained narratives of visits between respondent mother and R.L. and showed no unusual incidents or negative interactions occurring during these visits. The trial court also admitted into evidence respondent mother's exhibit 7, a client service plan dated October 21, 2002, documenting that respondent mother's progress toward return home of another child, Joey, was satisfactory as she had completed services and was attending therapy.

Respondent mother then testified on her own behalf that she had been in a romantic relationship with Alejandro Perez for two years and four months. Respondent mother testified her relationship with Perez had no domestic violence. Respondent mother testified she had taken two or three different parenting programs and did not feel she was dependant on Perez and could go on by herself if her relationship with him ended. Respondent mother testified she wanted R.L. returned to her. All parties then rested.

The trial court found: "It's not slavish adherence to service plans, but totality of the evidence in this case that make it clear and convincing to this Court that mother did not make satisfactory progress." The trial court also stated: "It is not a question of whether or not ultimately mother made reasonable progress toward return home because that is not what the statute reads. The question is whether if [there was] any nine month period after adjudication where mother did not make progress." The trial court specifically stated that the mother was rated "unsatisfactory" from April to October 2000, from October 2000 to April 2001, and from April to October 2001. The trial court noted that respondent mother's progress in therapy was minimal and stated, "[t]here is a difference between effort and progress. And that is what the statute intended." The trial court then found respondent mother unfit under section 1(D)(m) for "failing to make reasonable progress." 750 ILCS 50/1(D)(m)(ii) (West 2000).

## Best Interest Hearing

The trial court then proceeded to the best interest hearing. Trejo testified R.L. was currently five years old and had been placed in a traditional foster home since October 1998, when he was five months old. There were no signs of abuse, neglect, or unusual incidents in the foster home and R.L.'s foster parents ensured that he received prescribed language services. R.L. was also attending kindergarten and his foster parents helped him with school work. Trejo also testified that R.L. lived with his 14-month-old biological brother in the foster home. Trejo believed that terminating respondent mother's parental rights would be in R.L.'s best interest because of the extended time R.L. had been in the foster home and the bond he had with his foster parents. Trejo went on to describe specific interactions between R.L. and his foster parents which indicated a familial bond.

On cross-examination by the public guardian, Trejo testified that when R.L. visited with respondent mother, he acted as if he were seeing a friend or family member and the visits were appropriate. However, Trejo also testified that during visits between R.L. and respondent mother, R.L. would often not listen to respondent mother and could not be directed by her. Moreover, R.L. told Trejo that he did not want to live with respondent mother. Trejo testified that R.L.'s foster parents were willing to allow respondent mother to maintain contact with R.L. through phone calls and visits, but R.L.'s foster parents wanted to adopt him.

On cross-examination by respondent mother, Trejo testified that visiting records documented that R.L. had developed a bond with respondent mother and would run to her and embrace her during visits. Trejo also testified that R.L.'s foster parents were going to move to Florida and R.L.'s biological brother would not be going with them. Trejo testified that R.L.'s foster parents planned to return to Chicago twice a year. Trejo testified respondent mother had always been loving and appropriate to R.L. and there were times when R.L. had a difficult time ending visits with her.

Respondent mother testified that she and R.L. have a bond and when he sees her he runs to her and hugs her. Respondent mother testified that R.L. would be better off with her.

The trial court then stated it was considering the statutory best interest factors. The trial court also noted that it was the State's burden to prove by a preponderance of the evidence that it was in the best interest of the minor, pursuant to the statutory factors, to terminate parental rights. The trial court went on to distinguish the case *sub judice* from *In re D.T.*, 338 Ill. App. 3d 133, 788 N.E.2d 133 (2003), based on the facts that in *D.T.*, (1) there was testimony that it

would be harmful to terminate the minor child's relationship with his mother, (2) the minor child wished to return home, and (3) there was a strong bond between the minor child and his mother. The court noted that in this case:

> "There is no such strong bond. And no therapist has come forward [n]or has any caseworker come forward to testify that it would be harmful to the minor for the relationship of parental rights to be terminated. Nor was there any testimony that the minor wanted to return home."

The trial court then found it was in R.L.'s best interest that respondent mother's parental rights be terminated. The trial court specifically found that R.L. felt loved by and was attached to his foster parents, who wanted to adopt him. The trial court also noted that R.L.'s bond with respondent mother was not strong.

> "The Court must look at what is in the best interest of the minor and not what is in the best interest of the mother. The only testimony provided besides the mother's was that when this child looks for anything he looks for the foster parent. It's his home where he receives comfort and nurturing. And in fact he does not have a strong bond with the mother. It's a preadoptive home. It's a home that he has known since October 1998. His special needs are being addressed.
>
> When it comes to the physical safety and welfare of this child, it's the foster parent who has been there and provided that. When it comes to his sense of attachment where he feels loved, actually feels love, which are the terms in the statute, where he has a sense of being valued, secure and familiar. When we look at his wishes, as best he can express, there are many factors. And indeed, relationships with siblings and other parental figures or relatives is a factor. And the Court considers that factor.
>
> In weighing all the factors based on the evidence presented [in this] best interest hearing, this Court must find that it's in the best interest of the minor that parental rights be terminated."

The trial court then ordered that a guardian be appointed to R.L. to consent to his adoption.

## ANALYSIS

### I. Reasonable Progress

Respondent mother first contends that the trial court erred in not specifying the nine-month period in which she failed to make reasonable progress toward the return home of R.L. The State and public guardian argue that respondent mother waived this argument as she failed to object at trial. Additionally, the State and public guardian argue that the trial court did specify the time periods on which it

based its decision as it referred specifically to the time periods respondent mother was found to be "unsatisfactory" in her service plans.

As a preliminary matter, we consider the argument raised by the State and public guardian regarding waiver. The record indicates that following the close of evidence during the fitness portion of the termination proceeding, the trial court noted:

"It's not slavish adherence to service plans, but the totality of the evidence in this case that make[s] it clear and convincing to this court that mother did not make satisfactory progress. When we look at the service plans—and reasonable progress toward the return home of the minor. It is true that mother was rated unsatisfactory by the caseworker in the date of evaluation for the period from April of 2000 to October 31st 2000, and the period of October 2000 to April 2001, and from the period of April 2001 to October 2001.

\* \* \*

Notwithstanding that, counselors have stated that natural mother has completed domestic violence counseling at Uptown Hull House and continues to surround herself with violent men. Mother has attended therapy[;] however, progress has been minimal. There is a difference between effort and progress. And that is what the statute intended. \*\*\* [W]hen the Court considers the reports of the therapist as well as her testimony, Ms. Monica [sic] Castillo states that in relevant part that [respondent mother] continues struggling to establish and maintain a stable lifestyle. It's highly improbable that she will make the necessary changes to provide a home and promote an environment for her child in the next year."

■ As pointed out by the State and public guardian, respondent mother failed to object or to indicate that the trial court's reference to unsatisfactory evaluation dates lacked specificity. We therefore agree with the State and public guardian that respondent mother waived review of this issue. "Questions not raised in the trial court cannot be argued for the first time on appeal." Parks v. Kownacki, 193 Ill. 2d 164, 180, 737 N.E.2d 287 (2000); In re D.F., 208 Ill. 2d 223, 238, 802 N.E.2d 800 (2003).

However, the rule of waiver is a limitation on the parties and not on this court. In re D.F., 208 Ill. 2d at 238, citing Dillon v. Evanston Hospital, 199 Ill. 2d 483, 504-05, 771 N.E.2d 357 (2002). We therefore choose to address this issue on the merits.

Respondent mother argues the order terminating her parental rights should be vacated and the matter remanded because the trial court failed to precisely state which nine-month period it considered

when ruling on whether or not she had made reasonable progress toward the return home of R.L. To support her proposition, respondent mother cites *In re D.F.*, 317 Ill. App. 3d 461, 740 N.E.2d 60 (2000), *In re J.D.*, 314 Ill. App. 3d 1109, 734 N.E.2d 93 (2000), and *In re E.B.*, 313 Ill. App. 3d 672, 730 N.E.2d 617 (2000).

In *In re D.F.*, the Appellate Court, Fourth District, vacated a trial court's order finding that the trial court considered conduct outside the statutorily prescribed time periods for each ground of parental unfitness. *In re D.F.*, 317 Ill. App. 3d at 466. In that case, the trial court was found to have erred in considering conduct that occurred before the adjudicatory hearing and before the trial court's order making DCFS the custodian of the child at issue. *In re D.F.*, 317 Ill. App. 3d at 465. Similarly, *In re J.D.* dealt with a record that included evidence of events outside the statutory time frame for determining a parent's reasonable progress. *In re J.D.*, 314 Ill. App. 3d at 1110. The *In re J.D.* court found that "[t]he record is unclear whether the trial court examined events outside of the statutory time frame in determining whether respondent parents made reasonable progress" and remanded with directions to review the evidence. *In re J.D.*, 314 Ill. App. 3d at 1110. In *In re E.B.*, the appellate court found that the trial court had failed to specify the time period during which it was assessing evidence of a parent's reasonable efforts or progress. *In re E.B.*, 313 Ill. App. 3d at 674. "A court can sever a natural parent's rights to his or her child only through proceedings that strictly comply with the [Adoption] Act." *In re D.F.*, 317 Ill. App. 3d at 463; *In re C.M.*, 305 Ill. App. 3d 154, 163, 711 N.E.2d 809 (1999). Section 1(D)(m) specifies:

"The grounds of unfitness are any one or more of the following:

\* \* \*

Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or (ii) to make reasonable progress towards the return of the child to the parent within [nine] months after an adjudication of neglected or abused minor \*\*\*, or (iii) to make reasonable progress toward the return of the child to the parent during any [nine]-month period after the end of the initial [nine]-month period following the adjudication of neglected or abused minor \*\*\*." 750 ILCS 50/1(D)(m) (West 2000).

In this case, we reject respondent mother's contention that the trial court failed to specify the nine-month period it considered when determining that she had failed to make reasonable progress toward R.L.'s return home. The trial court clearly stated that it had considered all the evidence presented, including the fact that respondent mother's actions were rated "unsatisfactory" three times,

from April to October 2000, October 2000 to April 2001, and April to October 2001. Because the trial court did specify, *inter alia*, the dates it considered when determining respondent mother's unfitness, we find no error in its determination that respondent mother had not made reasonable progress toward the return home of R.L.

## II. Sufficiency of the Evidence

■ Respondent mother also maintains that the evidence adduced at trial demonstrated that she had made reasonable progress toward the return home of R.L. The State and public guardian contend the trial court's finding was not against the manifest weight of the evidence as respondent mother failed to make progress in therapy and was unable to adequately protect R.L. from her relationships involving domestic violence.

"The Juvenile Court Act of 1987 provides a bifurcated procedure to determine whether a parent's rights should be terminated." *In re M.A.*, 325 Ill. App. 3d 387, 390, 757 N.E.2d 613 (2001), citing 705 ILCS 405/2—29(2) (West 1998). The trial court must first hold an evidentiary hearing to determine whether a parent is unfit. *In re M.A.*, 325 Ill. App. 3d at 390. Upon a finding of unfitness, it must then determine whether the termination of a parent's rights is in the best interest of the minor. *In re M.A.*, 325 Ill. App. 3d at 390. "The trial court's finding of unfitness is accorded great deference and will not be overturned unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates the opposite result is the only proper one." *In re M.A.*, 325 Ill. App. 3d at 390, citing *In re Latifah P.*, 315 Ill. App. 3d 1122, 1128, 735 N.E.2d 1004 (2000).

Under the Adoption Act, a parent is considered unfit if she fails to make either (1) a reasonable effort to correct the conditions that led to the child's removal, or (2) reasonable progress toward the child's return home within nine months of the adjudication of neglect. 750 ILCS 50/1(D)(m) (West 2000). "Although the two bases coexist within the same subparagraph of the Adoption Act, they are distinct, each requiring separate analysis." *In re J.A.*, 316 Ill. App. 3d 553, 564, 736 N.E.2d 678 (2000). Only one ground of unfitness needs to be proved by clear and convincing evidence in order to find a parent unfit. *In re J.A.*, 316 Ill. App. 3d at 564. "Reasonable effort" is a subjective standard and is associated with the goal of correcting the conditions which caused the child's removal. *In re J.A.*, 316 Ill. App. 3d at 565. The focus is on the amount of effort reasonable for the particular parent involved. *In re M.A.*, 325 Ill. App. 3d at 391. Conversely, " '[r]easonable progress' is an objective standard that relates to making progress toward the goal of returning the child to the parent." *In*

*re M.A.*, 325 Ill. App. 3d at 391. Failure to make either reasonable efforts or reasonable progress can be grounds for an adjudication of unfitness. *In re M.A.*, 325 Ill. App. 3d at 391, citing *In re C.N.*, 196 Ill. 2d 181, 210-211, 752 N.E.2d 1030 (2001).

In this case, the trial court found respondent mother had not made "reasonable progress" toward the goal of returning R.L. In determining unfitness, the trial court may only consider evidence of the parent's conduct in any nine-month period following the adjudication of neglect, abuse, or dependency. 750 ILCS 50/1(D)(m) (West 2000). The trial court's adjudication order went into effect in March 2000, based upon a finding R.L. was abused and at a substantial risk for physical injury and neglect due to an injurious environment. Therefore, respondent mother's progress had to be assessed and measured in nine-month periods following that adjudication.

In finding respondent mother unfit, the trial court stated that it specifically considered the fact respondent mother's actions were rated unsatisfactory from April to October 2000, October 2000 to April 2001, and April to October 2001. During those time periods, the State's exhibits 4, 5, and 6 demonstrate, although respondent mother was attending parenting classes, domestic violence counseling, and personal counseling, she was unable to implement the skills taught. For example, respondent mother continued to surround herself with violent men, continued an unhealthy and unstable relationship with her paramour Ricardo L., and was unable to address issues regarding how she initially became involved with DCFS. Also, despite attending parenting classes respondent mother had difficulty setting boundaries that did not involve physical punishment. Moreover, Dr. Castillo testified respondent mother engaged in relationships without considering the effect they could have on R.L. Although respondent mother's brief emphasizes language on specific progress reports that characterizes her interactions with R.L. as favorable, the evidence, when taken as a whole, supports the trial court's finding.

We agree with the trial court that "there is a difference between effort and progress." Although respondent mother made an effort to learn good parenting techniques, her ability to implement the information she garnered proved unsuccessful. For all the aforementioned reasons, we conclude that the trial court's decision finding respondent mother unfit was not against the manifest weight of the evidence.

### III. Permanency Goal

■ Respondent mother contends her fundamental right to a parent and child relationship was denied where the trial court disallowed R.L. to return home before a hearing was held terminating her

parental rights. Specifically, respondent mother alleges the termination proceeding was improperly predetermined when, on March 14, 2002, the trial court entered a permanency goal of termination of parental rights. The State and public guardian argue that the trial court's entry of a "termination of parental rights" permanency goal before the termination proceeding did not violate respondent's mother's due process rights, as permanency hearings are mandated by statute to occur every six months and have no impact on subsequent termination petitions.

Pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 2000)), permanency goals are to be set every six months in order to determine the future status of the child. 705 ILCS 405/2—28(2) (West 2000). The trial court is directed to set a permanency goal that is in the best interest of the child, review the child's placement status, and set a placement goal for the child. 705 ILCS 405/2—28(2) (West 2000); see *In re Curtis B.*, 203 Ill. 2d 53, 55, 784 N.E.2d 219 (2002). Permanency hearings do not concern themselves with the issue of parental unfitness, as permanency hearings (1) contain no burden or standard of proof, (2) are designed to hear probative evidence, and (3) result in nonfinal orders. *In re Curtis B.*, 203 Ill. 2d at 58. Conversely, fitness hearings require clear and convincing evidence and any orders are final in nature. See *In re J.N.*, 91 Ill. 2d 122, 127, 435 N.E.2d 473 (1982) (final orders set or fix the rights of the parties).

In setting a permanency goal on March 14, 2002, the trial court noted that the permanency goal of "return home" had been previously ruled out. However, in its setting of a permanency goal in March 2000, the trial court did not enter a finding regarding respondent mother's unfitness or the actual return home of R.L. Respondent mother's fitness hearing was a separate hearing, held in February and April 2003. At the February and April 2003 fitness hearings, the State successfully demonstrated, by clear and convincing evidence and relevant testimony, that respondent mother had failed, under section 1(D)(m), to make reasonable progress toward the return home of R.L. Therefore, respondent mother suffered no due process violation.

### IV. Best Interest

■ Finally, respondent mother contends the trial court erred in finding that it was in R.L.'s best interest to terminate her parental rights as she loves R.L. and had made reasonable efforts to facilitate his return.

Cases involving the adjudication of abuse, neglect, and wardship are *sui generis* and each case must be decided on its own merits. *In re*

*D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112 (2001) ("[E]ach case is *sui generis* and must be decided on the particular facts and circumstances presented"). The State must prove by a preponderance of the evidence that it is in the child's best interest that the parental rights be terminated. *In re D.T.*, 338 Ill. App. 3d 133, 154, 788 N.E.2d 2d 133 (2003). "In making this determination, the court is required to consider the following factors: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background; the child's sense of attachment, including love, security, familiarity, \*\*\* continuity of relationships with parent figures and other relatives; the uniqueness of every family and child; the risks related to substitute care; and the preferences of the person available to care for the child. 705 ILCS 405/1—3(4.05) (West 2000)." *In re Dominique W.*, 347 Ill. App. 3d 557, 568-69, 808 N.E.2d 21 (2004). Accordingly, the trial court's decision finding termination is in the best interest of the child will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1115-16, 762 N.E.2d 701 (2002).

The evidence at the hearing on R.L.'s best interest revealed that R.L. was happy in a stable and safe foster home and had bonded with his foster family. The record also demonstrates that R.L.'s foster family wished to adopt him. R.L. had been living with his foster family since he was five months old. R.L.'s foster family ensured that he received language services and helped him with school work. Although the trial court believed respondent mother loved R.L., the trial court found R.L.'s bond with his mother was not strong. Moreover, the trial court noted that it was through R.L.'s foster parents that he received comfort, nurturing, security, and love. Therefore, based on the evidence presented we cannot say that the trial court's finding that R.L.'s best interest was served by terminating respondent mother's parental rights was against the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d at 1115-16.

## CONCLUSION

Accordingly, the trial court's orders terminating respondent mother's parental rights and authorizing the appointment of a guardian to consent to R.L.'s adoption are affirmed.

Affirmed.

CAHILL and BURKE, JJ., concur.