NOTICE
Decision filed 01/09/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250716-U

NO. 5-25-0716

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* OLANNI W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-JA-38 |
| | ) | |
| Ocheion W., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The adjudicatory order that found the minor to be neglected and the subsequent dispositional order that found the respondent to be unfit and unable to parent the minor are affirmed because the circuit court's findings were not against the manifest weight of the evidence.

¶ 2   The respondent, Ocheion W. (Father), appeals the circuit court of Champaign County's July 21, 2025, adjudicatory order and the August 19, 2025, dispositional order. On appeal, Father challenges the circuit court's findings that his minor child, Olanni, was neglected and that Father was unfit and unable to care for Olanni. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4   This case began on April 14, 2025, with the filing of a petition for adjudication of abuse, neglect, or dependency regarding Father's minor child, Olanni, who was born on April 5, 2025.

1

Count I of the petition alleged the minor was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2024)) by reason of being in an environment injurious to her welfare when she resides with her parents, Tonja W.[1] (Mother) and Father, as said environment exposes the minor to a risk of domestic violence. Count II of the petition alleged the minor was neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2024)) by reason of being in an environment injurious to her welfare when she resides with Mother in that said parent has failed to correct the conditions which resulted in a prior adjudication of parental unfitness to exercise guardianship and custody of the minor's siblings in Vermilion County case No. 15-JA-109.[2]

¶ 5    A shelter care hearing was held the same day. Father and Mother were present with their respective attorneys. Father and Mother stipulated to probable cause and immediate and urgent necessity for purposes of the shelter care hearing only.

¶ 6    Adjudicatory hearings were conducted on June 24, 2025, and July 21, 2025. The following evidence was submitted.

¶ 7    The State presented evidence from several law enforcement officers. Officer Raymond Rich, a former Urbana Police Department officer, testified that on April 14, 2024, at approximately 4:55 a.m., he was dispatched to 1004 South Smith Road, the apartment the respondents shared at the time, for a reported domestic disturbance. Officer Rich testified that Mother reported that she had been awakened by Father slapping her in the face and strangling her. Officer Rich observed finger-shaped marks on Mother's neck, one of her ears was bleeding, and one of her fingernails

___

[1]Tonja W. is Olanni's biological mother. She is not a party to this appeal.
[2]Vermilion County case No. 2015-JA-109 was filed on behalf of T.M., born June 2015, against Mother and Anthony P., as father. Vermilion County case No. 2015-JA-103 was filed on behalf of T.P., born July 2013, against Mother and Robert P., as putative father. These cases were opened after T.M., aged four months, presented to the hospital with non-accidental abusive head trauma.

was injured and bleeding. Father was not at the apartment when Officer Rich arrived; however, Officer Rich was able to speak to Father by telephone, at which time he admitted he had been intoxicated. Officer Rich followed up with Mother within a week of the incident. At that time, she informed him that she had fabricated the report she had given him and that she had been in an altercation with an unidentified person outside the apartment complex.

¶ 8 Officer Justin Merritt, of the Urbana Police Department, testified that on May 20, 2024, at approximately 2 a.m., he was dispatched to 1004 South Smith Road, due to a man calling about an argument he had with his girlfriend or wife. Upon his arrival, Officer Merritt spoke to a man who approached him from outside the apartment building, not from inside the residence, who told him that everything was okay following an argument with his wife. No arrests were made, and Officer Merritt completed a field interview report.

¶ 9 Officer Cale Reeves, of the Urbana Police Department, testified that on July 13, 2024, at approximately 3:30 a.m., he was dispatched to 1004 South Smith Road in response to a 911 call for a reported domestic incident. Upon his arrival, Officer Reeves spoke to Mother, who appeared intoxicated as she was stumbling in the apartment. Mother reported to Officer Reeves that a domestic altercation had occurred between her and Father. She reported that she was hit and kicked by Father; however, Officer Reeves noted he could not get a definite statement from Mother, and he observed no signs of injuries or evidence of a physical altercation in the apartment.

¶ 10 Officer Wade,[3] of the Urbana Police Department, testified that on July 20, 2024, at approximately 3:40 a.m., he was dispatched to 1004 South Smith Road in response to a 911 call for a reported domestic incident. Officer Wade spoke to Father, who indicated that a verbal

---

[3]Officer Wade did not provide his first name nor was it solicited during his testimony.

altercation had occurred with Mother, but nothing physical. Officer Wade was unable to speak with Mother because she refused to open the door to him.

¶ 11 Officer Todd Marcum, of the Urbana Police Department, testified that on July 27, 2024, at approximately 10 a.m., he was dispatched to 1004 South Smith Road in response to a 911 call made by Mother for a domestic altercation. As Officer Marcum arrived on scene, he was approached by Mother in the parking lot. Officer Marcum observed that Mother was distraught, with disheveled clothing, pink, puffy cheeks, and red, bloodshot eyes, as if she had been crying. Mother reported that she and Father had been lying in bed after she got out of the shower; Father became upset with the noise level and began striking her in the face and head. Officer Marcum observed minor injuries to Mother but noted they did not reflect the severity of the physical attack she described. Officer Marcum spoke to Father, who indicated that they were lying in bed together when Mother, who was intoxicated, began to strike him and scratch his face. At that point, he attempted to remove her, and then he exited the apartment because the last time police were called, Mother was arrested, and he did not want her to be arrested again. Upon returning to Mother, Officer Marcum overheard Mother speaking with her sister via video call. Mother reported to her sister that "she had engaged in a mutual physical altercation, and that she had beat up [Father], and that he was upset about it, and that's why he left." No arrests were made.

¶ 12 Officer Cyrus Bailey-Motamen, of the Urbana Police Department, testified that on February 24, 2025, at approximately 5 p.m., he was dispatched to 1004 South Smith Road because the caller wanted someone removed from the building. Upon his arrival at the apartment, Mother told Officer Bailey-Motamen that Father was no longer on the lease of the apartment and she wanted him to leave the premises. Personal property had been broken, but no injuries to either individual were observed.

4

¶ 13    Detective Zachary Ackerman, of the Urbana Police Department, testified that on March 3, 2025, at approximately 4:30 p.m., he was dispatched to 1004 South Smith Road in response to two individuals calling 911 on each other. Detective Ackerman spoke to Father, who indicated that he and Mother were separated but trying to work things out. Father was in the process of moving out, and an argument ensued in which Mother threw the lid of a trashcan at Father, striking him. Detective Ackerman did not observe any injuries to Father. Mother admitted to Detective Ackerman that she threw a trash can lid, but she stated that it was nowhere near Father, and that it struck a piece of trim. Father agreed to leave and return for his belongings later. No arrests were made.

¶ 14    The State called Parisha Boatright, a former child protection investigator for the Department of Children and Family Services (DCFS) to testify. She testified regarding her investigation into allegations of neglect involving Olanni. Following Olanni's birth, a report was made to DCFS due to Mother's prior indicated report of physical abuse to her older children. Boatright met with Mother and Father at Carle Hospital. Mother told Boatright that she had been involved in a prior DCFS case approximately 11 years earlier regarding her sons. Mother told Boatright that she did not remember much about the case, and she did not understand it. Mother reported that the services she was to complete in that case were to maintain housing and employment, visit her children, and remain in contact with DCFS. Mother eventually surrendered her parental rights to her sons. Mother also reported that her youngest son, T.M., later died from his injuries. Boatright explained that, due to the prior case, the original plan in this case was for Mother to have access to Olanni as long as she was supervised by Father or a nurse in the hospital.

¶ 15    Boatright continued her investigation by requesting police reports related to the prior DCFS case. She also found police reports regarding domestic violence incidents between Father and

Mother. Due to the prior DCFS case and the police reports regarding domestic violence, DCFS thought protective custody was warranted.

¶ 16    Boatright questioned Father and Mother regarding their relationship. She was told that they had been married at one point, then divorced, and were in the process of "working it out." They reported there was no domestic violence.

¶ 17    Following Boatright's testimony, a certified copy of the case file for Vermilion County case No. 2015-JA-109 was admitted into evidence in the present matter. The case concerned T.M., and Father was not a party to the case. T.M., aged four months, suffered non-accidental abusive head trauma, which was inflicted by his biological father, Anthony P., and permitted to occur by Mother. In October 2015 T.M. was diagnosed with a traumatic brain injury, multiple brain hemorrhages, a midline shift of his brain, a right skull fracture to the back of his head, multiple areas of cerebral infarction, and a collapsed left lung.

¶ 18    In Vermilion County case No. 2015-JA-109, Mother was to engage in the following services: traumatic brain injury education, maintain employment, attend medical appointments for T.M., substance abuse assessment/treatment, regular contact and visitation, individualized interactive parenting education, individual therapy, and cooperation with DCFS. A permanency screening action form completed on December 1, 2016, indicated that, as of that date, Mother had not completed any of her services and had not visited T.M. since April 13, 2016. Mother filed a final and irrevocable surrender of her parental rights for purposes of adoption on November 30, 2016.

¶ 19    Next, Mother testified on her own behalf. She testified that she had cases in Vermilion County regarding two other children. Mother stated that the services she was aware she was required to complete were to maintain a household, maintain employment, stay in contact with

DCFS, and visit with her sons. Mother testified that she engaged in those services and stayed in contact with her sons' foster parents.

¶ 20    Mother testified that she had been in a relationship with Father, but that it ended while she was still pregnant. She estimated the relationship ended while she was in the middle of her pregnancy. She said Father was at the hospital when Olanni was born because he was her father, and not because they were in a relationship. Mother stated that Boatright did not ask her about her relationship with Father. Further, Mother said Boatright did not ask her about any domestic violence involving Father.

¶ 21    Mother testified that she and Father were married in 2019, but that she did not recall when they divorced. They rekindled their relationship, and it ended again when Mother was approximately six months pregnant. Father lived with Mother at 1004 South Smith Road for approximately one year. Father did not live there as of March 2025 but he was still moving things out of the apartment. Mother testified that the police were called to the apartment in June 2024. Mother was arrested. She said the case was "thrown out."

¶ 22    Finally, Father testified on his own behalf. Father testified that Boatright did not speak to him regarding his relationship with Mother or ask him whether there was domestic violence.

¶ 23    Father testified that he wanted Mother to sign over her parental rights to Olanni to him so he could take Olanni home from the hospital, because her prior DCFS case was the problem. Father testified that he and Mother were not married when Olanni was born. Father had not signed a voluntary acknowledgement of paternity, and a DNA test had not been completed, but was scheduled.

¶ 24     After hearing arguments from counsel and the recommendation from the guardian *ad litem* (GAL), the circuit court found that both counts of the petition had been proven. The circuit court entered an adjudicatory order on July 21, 2025, finding Olanni to be a neglected minor.

¶ 25     The matter proceeded to a dispositional hearing on August 19, 2025. The circuit court considered a report prepared by Cheyanne Thompson, a foster care family worker with the Center for Youth and Family Solutions (CYFS), that was filed on August 12, 2025[4]. The information contained in the report was gathered from an integrated assessment. During the integrated assessment, Father provided conflicting information regarding prior reports and refused to answer questions about any prior DCFS history, criminal involvement, social history, economic status, and relationship history and clarifications.

¶ 26     The report contained the following information regarding Father. Father has 10 children with 10 different mothers. His children range in age from 18 years to 4 months, with Olanni being the youngest. An amendment to the report noted that the two-year-old child lives with Father in his own three-bedroom apartment in Urbana.

¶ 27     On July 23, 2025, Father reported he was unemployed. He also reported that he previously worked for Lyft, delivered for Amazon, and had a landscaping business. Father also reported receiving Social Security benefits of an unspecified amount. At the time of the dispositional hearing, Father's counsel advised that Father had recently obtained employment performing maintenance work at two different apartment buildings.

¶ 28     Father reported no mental health issues. He also denied any current alcohol or substance use. An April 2024 police report referenced Father being intoxicated. Father was incarcerated for

---

[4]Additions and corrections to the report were made at the time of the dispositional hearing. The relevant additions and corrections will be provided along with the information from the original report.

drug-related charges in the past, but he refused to provide further details. Father failed to comply with drug screens on May 23, 2025, May 27, 2025, and August 5, 2025. He was not scheduled for any drug screens in June or July.

¶ 29 The report detailed eight instances of domestic violence between Father and Mother spanning from April 2024 through March 2025. Father reported that he was not in a romantic relationship with anyone. Father visits with Olanni on Fridays for two hours and on Saturdays for four hours. Olanni has been placed with her paternal grandmother. Visits are supervised. Father appears to be nurturing and caring during visits with Olanni.

¶ 30 Father's service recommendations following the integrated assessment are establish paternity, complete a substance abuse assessment, random drug testing, provide information related to his children and their mothers, complete a mental health assessment, psychiatric consultation, anger management program, a parenting program, CYFS monitoring for issues of power and control, and domestic violence services.

¶ 31 No additional testimony was presented at the dispositional hearing. The circuit court indicated it had reviewed the dispositional report and the corrections and additions that were made to the report. Next, the circuit court heard arguments and recommendations from counsel and the GAL. After considering the report and evidence adduced at the prior hearings, the circuit court found that it was in Olanni's best interest that she be made a ward of the court. The circuit court also found Father was unfit and unable to care for Olanni. The circuit court noted that Father was not cooperative with the integrated assessment. The circuit court noted the history of domestic violence with the element of intoxication. The circuit court entered a written dispositional order the same day. Father filed a timely notice of appeal.

9

II. ANALYSIS

¶ 33    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The first step in the process is the State filing a petition for wardship. *In re Arthur H.*, 212 Ill. 2d at 462. Then, a temporary custody hearing is conducted at which the court must "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal." *In re Arthur H.*, 212 Ill. 2d at 462. If probable cause is found, the child is placed in temporary custody, and the process continues. *In re Arthur H.*, 212 Ill. 2d at 462.

¶ 34    The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *In re Arthur H.*, 212 Ill. 2d at 462. "Section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2000)) defines a 'neglected minor' to include 'any minor under 18 years of age whose environment is injurious to his or her welfare.' " *In re Arthur H.*, 212 Ill. 2d at 462. The general definition of "neglect" is the " ' "failure to exercise the care that circumstances justly demand." ' " *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "Neglect" is not limited or fixed to this definition. By necessity, "neglect" is fluid and includes both willful and unintentional disregard of duty. *In re Arthur H.*, 212 Ill. 2d at 463. Similarly, "injurious environment" does not have a fixed definition but has been interpreted to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her

children.' " *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 35 "At the adjudicatory hearing, 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *In re A.P.*, 2012 IL 113875, ¶ 19 (2012) (quoting 705 ILCS 405/2-18(1) (West 2010)). "The legislature has stated that the purpose of an adjudicatory hearing is 'to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence.' " *In re Arthur H.*, 212 Ill. 2d at 465 (quoting 705 ILCS 405/1-3(1) (West 2000)). "The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected." *In re Arthur H.*, 212 Ill. 2d at 465. "The legislature made no mention in this provision that during the adjudicatory stage of the proceedings the circuit court is also to determine who may be responsible for the child's neglect, and to assess the proportion of [the] blame with respect to such individuals." *In re Arthur H.*, 212 Ill. 2d at 465.

¶ 36 "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463. It is the State's burden to prove allegations of neglect by a preponderance of the evidence, meaning the State must prove the allegations are more probably true than not. *In re Arthur H.*, 212 Ill. 2d at 463-64. Neglect and injurious environment findings are fact-driven. *In re Arthur H.*, 212 Ill. 2d at 463-64. On review, a finding of neglect will not be reversed unless it is against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d at 464. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d. at 464. This court will not disturb the circuit court's findings unless the record clearly demonstrates that the court should have reached the opposite result or that the court's determination is unreasonable,

11

arbitrary, and not based on evidence. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 37    If a finding of abuse, neglect, or dependence is made, the matter proceeds to the third step, at which point the circuit court must hold a dispositional hearing. 705 ILCS 405/2-21(2) (West 2024).

> "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court, and, if the minor is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. The court also shall consider *** the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2-22(a) (West 2024).

¶ 38    At the dispositional hearing, the circuit court must first determine whether the minor is to be made a ward of the court. *In re C.L.*, 384 Ill. App. 3d 689, 693 (2008). The determination of whether to make the minor a ward of the court "is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15.

¶ 39    After determining a minor should be a ward of the court, the circuit court then considers "the need for [a] guardianship and whether a parent is dispositionally unfit." *In re C.L.*, 384 Ill.

App. 3d at 693. "When ruling on parental unfitness, a court is not to consider the child's 'best interests.' " *In re Latifah P.*, 315 Ill. App. 3d 1122, 1128 (2000). " '[I]t is the parent's past conduct in the then-existing circumstances that is under scrutiny.' " *In re Latifah P.*, 315 Ill. App. 3d at 1128 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990)). "[T]he term 'unfit' in the section relating to removing custody and guardianship from a parent following a finding of neglect differs in meaning from the unfitness required to be found for termination of parental rights for purposes of appointing a guardian with consent to adopt." *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991).

¶ 40    The circuit court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d at 1061. Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the circuit court's findings merely because the reviewing court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998). A circuit court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 41    "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather, "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what

13

they must do to retain their rights to their child' in the face of any future termination proceedings." *In re April C.*, 326 Ill. App. 3d at 237.

¶ 42 On appeal, Father argues that the circuit court's findings as to both counts of neglect were against the manifest weight of the evidence. "Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 14 (2005). Further, "the only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." *In re Arthur H.*, 212 Ill. 2d at 467. Father's brief concedes that Mother did not complete all of the services assigned to her for the Vermilion County cases. This alone is sufficient to affirm the circuit court's finding that Olanni was neglected. Further, which parent is responsible for the neglect is irrelevant.

¶ 43 Turning to the allegations of neglect due to an injurious environment that exposes the minor to domestic violence, Father argues that Olanni has not lived with both Mother and Father as they are no longer living together and no longer in a relationship. However, Olanni was taken into protective custody and placed with her paternal grandmother upon her discharge from the hospital following her birth. The circuit court heard testimony regarding the history of domestic violence between Father and Mother, with the last event occurring on March 3, 2025, approximately a month before Olanni's birth. The circuit court is to review "the parent's past conduct in the then-existing circumstances." *In re Adoption of Syck*, 138 Ill. 2d at 276. Accordingly, we cannot say it was against the manifest weight of the evidence to find Olanni neglected under count I of the petition as well.

¶ 44 Next, Father argues that the finding that he was unfit and unable to parent Olanni was against the manifest weight of the evidence. Father does not challenge the circuit court's finding that Olanni be made a ward of the court.

¶ 45 As to Father's dispositional finding of unfitness, his brief merely urges this court to reconsider and reweigh the evidence that was presented to the circuit court. Father points to the dispositional report's statement describing him as being "nurturing and caring" of Olanni during visits, having good relationships with his other children, and being employed. However, Father fails to address the negative factors from the dispositional report that the circuit court considered. It is not our role as a reviewing court to reweigh the evidence. See *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). Based on the totality of the circumstances, we find that a result opposite to that reached by the circuit court as to Father's fitness was not clearly apparent, and the result reached by the circuit court was supported by the evidence.

¶ 46                                    III. CONCLUSION

¶ 47 For the foregoing reasons, we affirm the July 21, 2025, and August 19, 2025, orders of the circuit court of Champaign County.

¶ 48 Affirmed.